# Syllabus

Chief Justice:
Robert P. Young, Jr.

Justices:
Michael F. Cavanagh
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Corbin R. Davis

*In re* ADAMS

Docket No. 144985. Argued April 11, 2013 (Calendar No. 7). Decided June 19, 2013.

The Judicial Tenure Commission (JTC) issued a formal complaint against Judge Deborah Ross Adams of the 3rd Circuit Court, alleging three counts of misconduct, including misrepresentations under oath, forgery and the filing of forged and unauthorized pleadings, and misrepresentations to the commission. The Supreme Court appointed the Honorable Donald G. Miller to act as master in the matter. After the hearing, Judge Miller found that 2 out of the 3 counts alleged in the JTC complaint were established by a preponderance of the evidence. With regard to count 3, Judge Miller found that 3 out of the 7 allegations of misrepresentations to the commission had been established by a preponderance of the evidence. After hearing oral arguments, the JTC adopted the master's findings with certain exceptions and concluded that respondent had committed judicial misconduct with regard to all three counts of the complaint in violation of MRPC 3.3(a)(1), MCR 9.104(A), MCR 9.208(B), and Canons 1 and 2 of the Code of Judicial Conduct. The JTC recommended that respondent be suspended without pay for 180 days and ordered to pay costs in the amount of $8,498.40.

In an opinion by Justice MARKMAN, joined by Chief Justice YOUNG and Justices KELLY, ZAHRA, and VIVIANO, the Supreme Court *held*:

The Supreme Court affirmed the JTC's factual findings and conclusions of law. However, the JTC's recommendation of a 180-day suspension was rejected because the cumulative effect of respondent's misconduct warranted her removal from office.

1. Respondent made false statements under oath in Judge Brennan's courtroom when she repeatedly denied that she had called Judge Brennan's chambers while represented by counsel.

2. Respondent signed her former attorney's name on legal documents without her permission and filed those documents with the court, also without her permission. Respondent's assertion that she thought she had her former attorney's permission to sign the documents and file them with the court was not credible.

3. As found by the JTC, respondent misrepresented to the JTC that she had contacted Judge Brennan's chambers on only four occasions; that Judge Brennan's staff had never told her that it was improper for her to make calls to them while she was represented by counsel; and that her former attorney had given respondent permission to sign her former attorney's name on legal

documents and file them with the court and that she had given her former attorney copies of those documents.

4. Applying the judicial-discipline recommendations set forth in *In re Brown*, 461 Mich 1291, 1292-1293; 625 NW2d 744 (2000), the Supreme Court concluded that respondent engaged in a pattern or practice of calling Judge Brennan's chambers while represented after having been warned not to do so, signing her former attorneys' names to documents without their permission, testifying falsely under oath, and lying to both the JTC and the Supreme Court; that respondent's misconduct was prejudicial to the actual administration of justice; that respondent's lies to the JTC and the Supreme Court, as well as her signing of her former attorney's name on documents and filing them with the court without her former attorney's permission, were deliberate; and that respondent's false testimony under oath undermined the ability of the justice system to discover the truth of what occurred in this legal controversy. At least five out of the seven *Brown* factors weighed in favor of a more severe sanction.

5. Our judicial system has long recognized the sanctity and importance of the oath. An oath is a significant act, establishing that the oath taker promises to be truthful. As the focal point of the administration of justice, a judge is entrusted by the public and has the responsibility to seek truth and justice by evaluating the testimony given under oath. Testifying falsely under oath, as respondent has been adjudged to have done, is conduct that is the antithesis of judicial integrity. The effectiveness of our judicial system is dependent upon the public's trust and confidence and when a judge testifies falsely under oath, the public's trust and confidence in that system can only be seriously eroded. Testifying falsely under oath is antithetical to the role of a judge who is sworn to uphold the law and seek the truth. When a judge testifies falsely under oath, he or she has failed to demonstrate in his or her personal affairs standards of conduct indispensable to a judge of this state and becomes unfit to sit in judgment of others.

6. Because at least five out of the seven *Brown* factors weighed in favor of a more severe sanction and because respondent testified falsely under oath—conduct which is entirely antithetical to the role of a judge who is sworn to uphold the law and to seek the truth—and because respondent continues to deny any responsibility for her wrongdoing or show any indication of remorse for such wrongdoing, removal from office is warranted.

Removal from office ordered and, pursuant to MCR 9.205(B), respondent ordered to pay costs of $8,498.40.

Justice MCCORMACK, joined by Justice CAVANAGH, concurring in part and dissenting in part, agreed with the majority's adoption of the JTC's factual findings and conclusions of law. However, considering the entire factual context of the case, including the fact that none of respondent's misconduct carried over to the performance of her duties as a judicial officer, and according the JTC's recommendation considerable deference, Justice MCCORMACK would have adopted the JTC's recommended sanction of a 180-day suspension.

©2013 State of Michigan

# Opinion

Chief Justice:    Justices:

Robert P. Young, Jr.    Michael F. Cavanagh
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra
Bridget M. McCormack
David F. Viviano

FILED JUNE 19, 2013

S T A T E  O F  M I C H I G A N

SUPREME COURT

In re Honorable DEBORAH ROSS          No. 144985
ADAMS, Judge, 3rd Circuit Court

_____

BEFORE THE ENTIRE BENCH

MARKMAN, J.

The Judicial Tenure Commission (JTC) has recommended that respondent, 3rd Circuit Court Judge Deborah Ross Adams, be suspended without pay for 180 days and be ordered to pay costs in the amount of $8,498.40. Respondent has filed a petition asking this Court to reject that recommendation. We affirm the JTC's factual findings and conclusions of law, but conclude at the same time that it is necessary and appropriate to remove respondent from office for the remainder of her term. The evidence establishes that respondent: (a) committed perjury; (b) signed her former attorney's name on legal documents without the latter's permission and filed these documents also without such permission; and (c) made numerous misrepresentations of fact under oath during the JTC proceedings. The cumulative effect of respondent's misconduct convinces this Court that

respondent should not remain in judicial office, and we therefore remove her from such office. In addition, because respondent engaged in conduct involving "deceit or intentional misrepresentation," pursuant to MCR 9.205(B), we order respondent to pay costs of $8,498.40 to the JTC.

## I. FACTS AND HISTORY

On April 17, 2012, the JTC filed Formal Complaint No. 89 against respondent, alleging three counts of misconduct. It asserted that respondent had engaged in: (a) "misrepresentations under oath;" (b) "forgery and filing of forged and unauthorized pleadings;" and (c) "misrepresentations to the commission." With regard to count one, the complaint asserted that while respondent was the defendant in a divorce case before Oakland Circuit Court Judge Mary Ellen Brennan, respondent repeatedly called Judge Brennan's chambers despite being advised each time by Judge Brennan's staff that such contact was improper while respondent was represented by counsel. At a subsequent hearing and while under oath, when Judge Brennan told respondent that she must stop calling her chambers, respondent denied ever doing so while she was represented by counsel. Respondent stated that she had her clerk call Judge Brennan's chambers on one occasion to determine if the time of the hearing could be changed. Judge Brennan's secretary, Kirsten Turner, testified that on March 15, 2011, she spoke to a woman who identified herself as Judge Adams. In response, respondent stated, "that's not correct." When Judge Brennan noted that respondent had previously stated that she had her clerk call Judge Brennan's chambers, respondent denied ever having said that.

2

With regard to count two, the complaint alleged that after attorney Andra Dudley was released from representing respondent, respondent prepared a motion to set aside or modify the judgment of divorce, a supporting brief, and a notice of hearing, to all of which she signed Ms. Dudley's name without the latter's knowledge or permission and filed them with the court, also without such knowledge or permission.

With regard to count three, the complaint alleged that respondent falsely told the JTC that: (a) she had been walking away from counsel's table, on her way out of the courtroom, when Judge Brennan asked respondent about calling her chambers the day before; (b) she had only contacted Judge Brennan's chambers on four occasions; (c) nobody in Judge Brennan's chambers had told her that it was improper for her to call Judge Brennan's chambers while she was represented by counsel; (d) she had Ms. Dudley's permission to file pleadings on Ms. Dudley's behalf; (e) she also had permission to sign Ms. Dudley's name to the motion that was filed on May 5, 2011; (f) she had provided a copy of the motion to Ms. Dudley; and (g) she had provided Ms. Dudley with notice of the hearing date for the motion.

Also on April 17, 2012, the JTC filed a request for the appointment of a master. Nine days later on April 26, 2012, this Court appointed the Honorable Donald G. Miller as the master, and a hearing began on September 11, 2012, and concluded on September 17, 2012. On October 9, 2012, the master filed his findings of fact and conclusions of law with the JTC. With regard to count one, the master concluded that "the Examiner has, by a preponderance of the evidence,[1] shown that Respondent did in

---

[1] See MCR 9.211 ("The examiner shall present the evidence in support of the charges set forth in the complaint, and at all times shall have the burden of proving the allegations by

fact violate MCL 750.423 by making false statements under oath."[2] With regard to count two, the master concluded that there was insufficient evidence to find that respondent violated the forgery statute, MCL 750.248,[3] or the uttering and publishing statute, MCL 750.249,[4] because there was no evidence presented to indicate that respondent had acted

a preponderance of the evidence.").

[2] MCL 750.423(1) provides:

> Any person authorized by a statute of this state to take an oath, or any person of whom an oath is required by law, who willfully swears falsely in regard to any matter or thing respecting which the oath is authorized or required is guilty of perjury, a felony punishable by imprisonment for not more than 15 years.

[3] MCL 750.248(1) provides:

> A person who falsely makes, alters, forges, or counterfeits a public record, or a certificate, return, or attestation of a clerk of a court, register of deeds, notary public, township clerk, or any other public officer, in relation to a matter in which the certificate, return, or attestation may be received as legal proof, or a charter, will, testament, bond, writing obligatory, letter of attorney, policy of insurance, bill of lading, bill of exchange, promissory note, or an order, acquittance of discharge for money or other property, or a waiver, release, claim or demand, or an acceptance of a bill of exchange, or indorsement, or assignment of a bill of exchange or promissory note for the payment of money, or an accountable receipt for money, goods, or other property with intent to injure or defraud another person is guilty of a felony punishable by imprisonment for not more than 14 years.

[4] MCL 750.249(1) provides:

> A person who utters and publishes as true a false, forged, altered, or counterfeit record, instrument, or other writing listed in [MCL 750.248] knowing it to be false, altered, forged, or counterfeit with intent to injure or defraud is guilty of a felony punishable by imprisonment for not more than 14 years.

4

with an "intent to injure or defraud" when she signed Ms. Dudley's name on the legal documents and filed them with the court.

Finally, with regard to count three, the master concluded that there was sufficient evidence to support three out of the seven allegations of misrepresentations to the JTC. Specifically, the master concluded that there was sufficient evidence that respondent had lied to the JTC about: (a) having contacted Judge Brennan's chambers on only four occasions; (b) having never been told by Judge Brennan's staff that it was improper for her to call them while she was represented by counsel; and (c) having Ms. Dudley's permission to affix her signature to the motion filed on May 5, 2011. But the master found that there was insufficient evidence to find that respondent had lied about: (a) having been walking out of Judge Brennan's courtroom when Judge Brennan asked her about calling her chambers the day before; (b) having Ms. Dudley's permission to file pleadings on her behalf; (c) having supplied a copy of the motion to Ms. Dudley; and (d) having supplied a copy of the notice of the hearing to Ms. Dudley.

The JTC then held a hearing on December 3, 2012, and issued its decision and recommendation for discipline on December 28, 2012. The JTC adopted the master's findings except, unlike the master, the JTC determined that: (a) "Respondent could not possibly believe that she had Ms. Dudley's permission to sign and file pleadings under Ms. Dudley's signature;" and (b) "Respondent failed to provide Ms. Dudley with a copy of the May 5, 2011 Motion and accompanying documents." The JTC concluded that the examiner had proven by a preponderance of the evidence all the allegations in counts one

5

and two[5] of the complaint and, with a single exception, all the allegations in count three of the complaint.[6] It concluded that respondent violated MRPC 3.3(a)(1), MCR 9.104(A), MCR 9.208(B), and Canons 1 and 2 of the Code of Judicial Conduct. In determining an appropriate sanction, the JTC considered the seven factors that this Court set forth in *In re Brown*, 461 Mich 1291, 1292-1293; 625 NW2d 744 (2000). Finding that respondent's misconduct implicated at least five of the seven *Brown* factors and recognizing that this Court has held that "[l]ying under oath is the antithesis of judicial

---

[5] The JTC determined that the master had erred by analyzing the allegations in count two of the complainant under the standards set forth in the criminal statutes for forgery and uttering and publishing. That is, the master could have found that respondent signed Ms. Dudley's name on the motion and filed it without Ms. Dudley's permission without having to also find that respondent did this with an "intent to injure or defraud." We agree. We do not have to find that respondent violated a criminal statute to conclude that respondent engaged in judicial misconduct worthy of a sanction. See *In re Halloran*, 466 Mich 1219, 1220; 647 NW2d 505 (2002) ("[T]he Supreme Court has found a judge's conduct to violate the Code of Judicial Conduct without regard to whether criminal charges were filed, or even in cases in which a judge has been acquitted in criminal proceedings."). Similarly, respondent's contention that the JTC violated Michigan's 'separation of powers' doctrine, Const 1963, art 3, § 2, by charging respondent with felony violations is meritless. Although the JTC clearly does not possess the authority to bring criminal charges against a judge, it just as clearly *does* possess the authority to investigate and adjudicate the conduct of judges, including conduct that may also involve violations of criminal laws. See Canon 2(B) of the Michigan Code of Judicial Conduct ("A judge should respect and observe the law."); *In re Mikesell*, 396 Mich 517, 528; 243 NW2d 86 (1976) ("The proceedings of the [JTC] are investigatory and advisory and are not binding upon the Supreme Court. No determination of criminal guilt is made, but merely a determination of the [JTC's] view of the conformity of the subject of investigation to the state constitutional standards for judicial office. Similarly, the resulting Order of the Supreme Court does not operate as a sanction for criminal guilt but as a judgment on judicial fitness.") (quotation marks and citation omitted).

[6] The JTC did not address the allegation that respondent lied to the JTC about having been walking away from counsel's table on her way out of the courtroom when Judge Brennan asked respondent about calling her chambers the day before.

integrity," *In re James*, 492 Mich 553, 582; 821 NW2d 144 (2012) (MARKMAN, J., concurring in part and dissenting in part), the JTC recommended that respondent be suspended without pay for 180 days and be ordered to pay costs in the amount of $8,498.40.[7]

## II.  STANDARD OF REVIEW

Const 1963, art 6, § 4 provides that "[t]he supreme court shall have general superintending control over all courts."  Const 1963, art 6, § 30(2) provides that

> [o]n recommendation of the judicial tenure commission, the supreme court may censure, suspend with or without salary, retire or remove a judge for conviction of a felony, physical or mental disability which prevents the performance of judicial duties, misconduct in office, persistent failure to perform his duties, habitual intemperance or conduct that is clearly prejudicial to the administration of justice.

MCR 9.225 provides that "[t]he Supreme Court shall review the record of the proceedings and file a written opinion and judgment, which may accept or reject the recommendations of the commission, or modify the recommendations by imposing a greater, lesser, or entirely different sanction."  This Court reviews de novo the JTC's

---

[7] MCR 9.205(B) provides:

> In addition to any other sanction imposed, a judge may be ordered to pay the costs, fees, and expenses incurred by the commission in prosecuting the complaint only if the judge engaged in conduct involving fraud, deceit, or intentional misrepresentation, or if the judge made misleading statements to the commission, the commission's investigators, the master, or the Supreme Court.

7

factual findings, conclusions of law, and disciplinary recommendations. *In re James*, 492 Mich at 560; *In re Halloran*, 466 Mich 1219, 1219; 647 NW2d 505 (2002).[8]

## III. ANALYSIS

## A. FACTUAL FINDINGS

After reviewing the record and hearing oral arguments, we agree with and adopt the factual findings of the JTC.

## 1. COUNT ONE: PERJURY

The master and the JTC both found that respondent made false statements under oath in Judge Brennan's courtroom. We agree. While respondent was under oath in Judge Brennan's courtroom, Judge Brennan asked respondent whether she had called Judge Brennan's chambers on the preceding day, March 15, 2011, and respondent said that she had not.[9] Indeed, respondent repeatedly denied ever having called Judge

---

[8] "[I]t is the JTC's, not the master's conclusions and recommendations that are ultimately subject to review by this Court." *In re Chrzanowski*, 465 Mich 468, 481; 636 NW2d 758 (2001).

[9] Respondent argues that she was not under oath when she was asked about the telephone call. We agree with the master and the JTC that she was. It is undisputed that respondent was placed under oath near the beginning of the proceedings on March 16, 2011, while she was at counsel's table. Respondent remained at counsel's table during the entire proceeding, she did not leave the courtroom, and she was not at any point told that she was no longer under oath. Indeed, when respondent indicated that she had not spoken to anyone in Judge Brennan's chambers the day before, Judge Brennan had her secretary, Kirsten Turner, brought into the courtroom and made it a point to place Ms. Turner under oath before asking Ms. Turner whether someone had called Judge Brennan's chambers the day before and identified herself as Judge Adams. On the basis of this evidence, we agree with the master and the JTC that respondent was-- and should have known that she was-- still under oath when she repeatedly denied having called Judge Brennan's chambers.

Brennan's chambers while she was represented by counsel.[10] However, both Judge Brennan's secretary, Kirsten Turner, and her clerk, Ryan Mathews, testified that respondent had called Judge Brennan's chambers on several occasions while represented by counsel. Respondent herself now admits that she did call Judge Brennan's chambers on March 15, 2011.

Respondent argues, however, that she did not intentionally or willfully make any false statements because when she denied calling Judge Brennan's chambers, she was under the impression that she was simply denying that she had tried to speak directly with Judge Brennan. This is belied by the fact that respondent did not just say, "I didn't call your chambers directly," but also repeatedly said, "I did not call your staff directly," and then, after Judge Brennan asked her, "Are you telling me that you did not have a conversation with anybody from my staff, from my office yesterday," respondent said, "I did not call anyone," "I did not have any conversation," and, finally, when Judge Brennan told respondent, "do not call my chambers[;] [d]on't call members of the staff, don't speak with clerks, don't speak with legal secretaries, don't speak with research attorneys, anybody who's a member of the staff; it's not appropriate," respondent replied, "the only time I've called your chambers was when I was unrepresented." At this point in the

_____

[10] Specifically, respondent stated at one point or another in this regard, "I didn't call your chambers directly;" I did not call your staff directly;" "I did not call anyone direct -- your chambers directly;" "Again, I did not call your staff -- your chambers directly;" "I did not call anyone -- your chambers;" "I did not have any conversation;" "I did not call your chambers directly;" "The only time I've called your chambers was when I was unrepresented;" "I haven't admitted to speaking with anyone;" "maybe someone from my court called but I did not call;" "I did not call here;" and "I've never called your chambers directly."

9

colloquy it was perfectly clear that Judge Brennan was asking respondent if she had called and talked to any of her staff and respondent clearly denied that she had ever done so while represented by counsel.

After this occurred, Judge Brennan had her secretary, Kirsten Turner, brought into the courtroom and placed under oath, and when Ms. Turner testified that respondent had called the day before, respondent replied, "That is not correct." Again, at this point, respondent had to have known that she was being asked whether she had called and spoken to Judge Brennan's secretary, not just whether she had tried to call Judge Brennan herself, and yet respondent still refused to admit that she had called and spoken to Judge Brennan's secretary. Respondent also testified falsely about whether her clerk had called Judge Brennan's chambers. Respondent first said that her clerk had called Judge Brennan's chambers to see if the hearing could be rescheduled, but then about one minute later denied ever having said that. On the basis of this evidence, we agree with and adopt the JTC's finding that respondent made false statements under oath in Judge Brennan's courtroom.[11]

## 2. COUNT TWO: FORGERY

The JTC found that respondent signed her former attorney's (Ms. Dudley's) name on legal documents (motion, brief, praecipe, and notice of hearing) without her permission and filed these documents with the court, also without her permission. We

---

[11] In addition to testifying falsely under oath in Judge Brennan's courtroom, we observe that respondent also treated Judge Brennan in a highly disrespectful manner. Respondent repeatedly interrupted Judge Brennan, spoke over her, and clearly sought to evade her questions.

10

agree.  While respondent admits that she signed Ms. Dudley's name on the documents and filed them with the court, she asserts that she believed that she did have Ms. Dudley's permission to do so.  Ms. Dudley testified that she did not sign the documents and she did not give respondent permission to sign or file the documents on her behalf.  Indeed, she testified that she had never given respondent permission to sign her name on any documents.  She also testified that respondent did not send her a copy of the legal documents.  Finally, Ms. Dudley testified that when she became aware that the documents had been signed and filed without her permission by way of a telephone call from respondent's now ex-husband's attorney, she emailed respondent, stating:

> I did not receive any contact from you this week and hopefully you did not file any pleadings with my name without me first reviewing them and without my permission.

We agree with the JTC that respondent's contention that she believed that she had Ms. Dudley's permission to sign Ms. Dudley's name on the legal documents and file them with the court is not credible.  To begin with, Ms. Dudley was not even representing respondent when respondent signed and filed the documents under Ms. Dudley's name.  The judgment of divorce expressly released Ms. Dudley from any further representation of respondent, and respondent was well-aware that Ms. Dudley was no longer representing her as evidenced by her May 5, 2011 email stating, "In the unlikely event the issue is not resolved tomorrow, I will retain an appellate person to handle the matter."

In addition, after respondent signed Ms. Dudley's name on the legal documents and filed them, respondent sent Ms. Dudley an email stating, "I tried contacting you earlier this week to obtain permission to file a quick pleading on my behalf under your

11

name."[12]   Respondent would not have tried to contact Ms. Dudley to obtain her permission to sign and file the documents under Ms. Dudley's name if she already had Ms. Dudley's permission to do so.  Respondent also did not indicate in any manner, on any of the documents, that she was signing Ms. Dudley's name with her permission.  Finally, as discussed above, Ms. Dudley testified that she had never given respondent permission to sign her name or file documents on her behalf.[13]   On the basis of this evidence, we agree with the JTC that respondent signed Ms. Dudley's name on legal documents absent Ms. Dudley's permission and filed these documents with the court, also without Ms. Dudley's permission.

### 3.  COUNT THREE: MISREPRESENTATIONS

Both the master and the JTC found that respondent made factual misrepresentations to the JTC.  We agree.  Specifically, both the master and the JTC found that respondent lied to the JTC about: (a) having contacted Judge Brennan's court on only four occasions; (b) having never been told by Judge Brennan's staff that it was improper for her to make calls to them while she was represented by counsel; and (c)

---

[12] Respondent argues that the admission of these emails violates the attorney-client privilege.  We disagree.  To begin with, as already discussed, when these emails were sent, Ms. Dudley was no longer respondent's attorney.  Furthermore, these emails do not contain "confidential communications between . . . a client and [her] attorney," *Schaibly v Vinton*, 338 Mich 191, 196; 61 NW2d 122 (1953), made "for the purpose of obtaining [or giving] legal advice," *Alderman v People*, 4 Mich 414, 423 (1857).

[13] Respondent's former attorney, Janice Burns, testified that respondent had also signed Ms. Burns' name on a motion without her permission, filed the motion without her permission, and never provided her with a copy of the motion.

having Ms. Dudley's permission to affix her signature to the motion filed on May 5, 2011. We agree.

Judge Brennan's secretary, Kirsten Turner, testified that there were between five to fifteen occasions on which respondent called Judge Brennan's chambers and she (Kirsten Turner) answered the telephone. In addition, Judge Brennan's clerk, Ryan Matthews, testified that there were between six to eight occasions on which respondent called Judge Brennan's chamber and he (Ryan Turner) answered the telephone. Both Ms. Turner and Mr. Matthews also testified that when respondent called while she was represented, they told her that she had to call her attorney and have her attorney call the office. On the basis of this evidence, we agree with and adopt the master's and JTC's findings that respondent lied to the JTC about having contacted Judge Brennan's court on only four occasions and having never been told by Judge Brennan's staff that it was improper for her to call them while she was represented by counsel. And, for the reasons already discussed with regard to count two, we agree with and adopt the master's and JTC's finding that respondent lied to the JTC about having Ms. Dudley's permission to affix her signature to the motion filed on May 5, 2011.

The JTC also found that respondent lied to the JTC about: (a) having Ms. Dudley's permission to file pleadings on her behalf; (b) having supplied a copy of the motion to Ms. Dudley; and (c) having supplied a copy of the notice of the hearing to Ms. Dudley. We agree. As already discussed above with regard to count two, Ms. Dudley testified that she never gave respondent permission to file pleadings on her behalf and respondent never supplied her with a copy of the motion or the notice of the hearing. Respondent's former attorney, Ms. Burns, testified that respondent had done the same

13

thing to her-- signed her name on a motion without her permission, filed the motion without her permission, and never provided her with a copy of the motion. After respondent signed Ms. Dudley's name on the legal documents and filed them, respondent sent Ms. Dudley an email stating, "I tried contacting you earlier this week to obtain permission to file a quick pleading on my behalf under your name." This email demonstrates that respondent was aware that she did not have Ms. Dudley's permission to file the pleading under her name at the time that she filed it. Ms. Dudley testified that she did not know that respondent had filed pleadings under her name until respondent's now ex-husband's attorney, William Brukoff, called her to discuss the pleadings. At this point, Ms. Dudley asked Mr. Brukoff to send her copies of the pleadings, and he did. According to Ms. Dudley, the only copies of the pleadings that she received were the ones sent to her by Mr. Brukoff. On the basis of this evidence, we agree with and adopt the JTC's findings that respondent lied to the JTC about: (a) having Ms. Dudley's permission to file pleadings on her behalf; (b) having supplied a copy of the motion to Ms. Dudley; and (c) having supplied a copy of the notice of the hearing to Ms. Dudley.

In addition to the factual misrepresentations identified by the JTC, we find that respondent also testified falsely about several other matters of varying significance. In one instance, respondent testified that she "didn't have control over scheduling" the March 16th hearing, and that she did not find out about this hearing until late on March 15th. However, Mr. Matthews testified that both parties were required to consent to the hearing date, and Ms. Dudley testified that she had told respondent about the March 16th hearing as early as March 11th, but no later than March 14th. Respondent also testified that she had never referred to herself as "Judge Adams" when she called

14

Judge Brennan's chambers. Yet Mr. Matthews testified that "the majority of time[s]" that respondent called, she had referred to herself in this manner. Finally, respondent testified that she sent the May 5th email to Ms. Dudley about how she had tried to contact Ms. Dudley to obtain her permission to file a pleading under Ms. Dudley's name because she was "trying to give [Ms. Dudley] another opportunity to file the motion" and respondent "was busy and . . . needed [Ms. Dudley] to do it." However, given that the motion had already been filed by respondent at the time this email was sent, it is clear that respondent did not send the email for this purpose.

B. CONCLUSIONS OF LAW

The JTC concluded that respondent violated MRPC 3.3(a)(1), MCR 9.104(A), MCR 9.208(B), and Canons 1 and 2 of the Code of Judicial Conduct. After reviewing the record and hearing oral arguments, we agree with and adopt the JTC's conclusions of law. Respondent violated MRPC 3.3(a)(1)[14] by testifying falsely under oath in Judge Brennan's courtroom and also by lying under oath during the JTC proceedings. She violated MCR 9.104(A)(1)-(5) by engaging in "conduct prejudicial to the proper administration of justice;" "conduct that exposes the legal profession or the court to obloquy, contempt, censure, or reproach;" "conduct that is contrary to justice, ethics,

---

[14] MRPC 3.3 provides, in pertinent part:

> (a) A lawyer shall not knowingly:

> (1) make a false statement of material fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer[.]

15

honesty, or good morals;" "conduct that violates the standards or rules of professional responsibility adopted by the Supreme Court;" and "conduct that violates a criminal law of a state or of the United States."[15] Respondent also violated MCR 9.104(A)(1)(6) by making a "knowing misrepresentation of any facts or circumstances surrounding a request for investigation or complaint," and she violated MCR 9.208 by lying to the JTC.[16] Respondent violated Canon 1 by failing to maintain "high standards of conduct so that the integrity and independence of the judiciary may be preserved."[17] Finally, respondent violated Canon 2 by failing to "avoid impropriety and appearance of impropriety" and by failing to "respect and observe the law."[18]

---

[15] At the very least, respondent violated the perjury statute, MCL 750.423(1).

[16] MCR 9.208(B) (cooperation with investigation) provides, "A judge, clerk, court employee, member of the bar, or other officer of a court must comply with a reasonable request made by the commission in its investigation."

[17] Canon 1 provides:

> An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should personally observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. A judge should always be aware that the judicial system is for the benefit of the litigant and the public, not the judiciary. The provisions of this code should be construed and applied to further those objectives.

[18] Canon 2 provides, in pertinent part:

> A Judge Should Avoid Impropriety and the Appearance of Impropriety in All Activities
>
> A. Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. A judge must expect to be the subject of

16

## C. SANCTIONS

The purpose of judicial disciplinary proceedings is to "protect the people from corruption and abuse on the part of those who wield judicial power." *In re Leon Jenkins*, 437 Mich 15, 28; 465 NW2d 317 (1991). "In determining appropriate sanctions, we seek to 'restore and maintain the dignity and impartiality of the judiciary and to protect the public.'" *In re James*, 492 Mich at 569, quoting *In re Ferrara*, 458 Mich 350, 372; 582 NW2d 817 (1998). We agree with the JTC's assessment of the *Brown* factors-- the considerations that this Court set forth to guide the formation of judicial-discipline recommendations.

The first *Brown* factor states that "misconduct that is part of a pattern or practice is more serious than an isolated instance of misconduct." *In re Brown*, 461 Mich at 1292. As the JTC explained, "Respondent's acts of calling Judge Brennan's chambers while represented, after Respondent had been warned not to do so, and her repeated unauthorized signing of her attorneys' names, Ms. Burns and Ms. Dudley, to various documents during the course of Respondent's divorce constituted a pattern and practice of misconduct during that period." In addition, respondent engaged in a pattern or practice of testifying falsely. To begin with, respondent repeatedly testified falsely under

constant public scrutiny. A judge must therefore accept restrictions on conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly.

B. A judge should respect and observe the law. At all times, the conduct and manner of a judge should promote public confidence in the integrity and impartiality of the judiciary. Without regard to a person's race, gender, or other protected personal characteristic, a judge should treat every person fairly, with courtesy and respect.

17

oath in Judge Brennan's courtroom. Respondent did not just *mistakenly* state that she had not called Judge Brennan's chambers on March 15, 2011. Instead, she repeatedly and quite vehemently denied ever calling Judge Brennan's chambers while she was represented by counsel. Further, she lied to the JTC about a variety of different matters, such as the number of times she had called Judge Brennan's chambers, whether anybody in Judge Brennan's chambers had told her that it was improper for her to call there while she was represented by counsel, whether she had Ms. Dudley's permission to sign her name and file pleadings on her behalf, whether she had provided a copy of the motion and notice of hearing to Ms. Dudley, when she was notified about the March 16th hearing, whether she referred to herself as "Judge Adams" when she called Judge Brennan's chambers, and why she had sent the May 5th email to Ms. Dudley. And now, respondent continues to lie to this Court about the very same matters. She continues to shirk any responsibility for her wrongdoings or express any indication of remorse. Although she now admits that she did call Judge Brennan's chambers, she claims that she did not intentionally testify falsely under oath when she vehemently and repeatedly denied calling Judge Brennan's chambers because she simply misunderstood Judge Brennan's questions. We believe this is disingenuous. As both the master and the JTC, and now this Court, have each concluded, this excuse is wholly unbelievable given the reality of the exchange that took place between Judge Brennan and respondent. Respondent lied to Judge Brennan, lied to the JTC, lied to the master, and lied to this Court. Therefore, respondent did not just engage in an "isolated instance of misconduct." As Justice YOUNG offered in *In re Noecker*:

18

> Where a respondent judge readily acknowledges his [or her] shortcomings and is completely honest and forthcoming during the course of the Judicial Tenure Commission investigation, . . . the sanction correspondingly can be less severe. However, where a respondent is not repentant, but engages in deceitful behavior during the course of a Judicial Tenure Commission disciplinary investigation, the sanction must be measurably greater. [*In re Noecker*, 472 Mich 1, 18; 691 NW2d 440 (2005) (YOUNG, J., concurring).]

The second *Brown* factor states that "misconduct on the bench is usually more serious than the same misconduct off the bench." *Id.* Again, we agree with the JTC that although there is no evidence that respondent committed misconduct on the bench, she did "attempt[] to leverage her position as a [Wayne County Circuit Court] judge in order to obtain special treatment not available to other non-judicial litigants." Despite being told by her attorney that Judge Brennan's staff stated that the March 16, 2011 hearing could not be rescheduled, respondent took it upon herself to personally call Judge Brennan's chambers in an attempt to reschedule the hearing. In addition, although respondent's misconduct did not occur while she herself was on the bench, she did repeatedly testify falsely under oath in a courtroom, with all the gravity that such a venue should communicate, especially to a judge, in response to questions asked of her by a judge on the bench.

The third *Brown* factor states that "misconduct that is prejudicial to the actual administration of justice is more serious than misconduct that is prejudicial only to the appearance of propriety." *Id*. at 1293. We agree with the JTC that respondent's misconduct was prejudicial to the actual administration of justice. Indeed, there is not much, if anything, that is more prejudicial to the actual administration of justice than testifying falsely under oath. Similarly, the fourth *Brown* factor states that "misconduct

19

that does not implicate the actual administration of justice, or its appearance of impropriety, is less serious than misconduct that does." *Id.* Again, we agree with the JTC that respondent's misconduct implicated the actual administration of justice.

The fifth *Brown* factor states that "misconduct that occurs spontaneously is less serious than misconduct that is premeditated or deliberated." *Id.* While respondent's lying under oath in Judge Brennan's courtroom may not have been premeditated, her continuingly disingenuous protestations before both the JTC and this Court of not having done this intentionally were most certainly premeditated, as were her other false statements before the JTC and this Court. That is, although respondent's initial false testimony about never having called Judge Brennan's chambers while she was represented may have been "spontaneous," all of her lies thereafter were made after she had time to reflect upon these matters, i.e., after periods of "deliberations." Respondent deliberately lied about: (a) misunderstanding Judge Brennan's questions; (b) how many times she had called Judge Brennan's chambers; (c) whether anybody in Judge Brennan's chambers had told her that it was improper for her to call Judge Brennan's chambers while she was represented by counsel; (d) whether she had Ms. Dudley's permission to sign her name and file pleadings on her behalf; (e) whether she had provided a copy of the motion and notice of hearing to Ms. Dudley; (f) when she was notified about the March 16th hearing; (g) whether she referred to herself as "Judge Adams" when she called Judge Brennan's chambers; and (h) why she had sent the May 5th email to Ms. Dudley. Respondent's signing of Ms. Dudley's name on legal documents and filing them with the court without Ms. Dudley's permission was also premeditated.

20

The sixth *Brown* factor states that "misconduct that undermines the ability of the justice system to discover the truth of what occurred in a legal controversy, or to reach the most just result in such a case, is more serious than misconduct that merely delays such discovery." *Id.* Testifying falsely under oath-- conduct in which respondent repeatedly engaged-- is certainly "misconduct that undermines the ability of the justice system to discover the truth of what occurred in a legal controversy."

Finally, the seventh *Brown* factor states that "misconduct that involves the unequal application of justice on the basis of such considerations as race, color, ethnic background, gender, or religion are more serious than breaches of justice that do not disparage the integrity of the system on the basis of a class of citizenship." *Id.* There is no evidence that respondent did anything to "disparage the integrity of the system on the basis of a class of citizenship."

Despite finding that at least five of the *Brown* factors weigh in favor of more severe sanctions, and despite recognizing that testifying falsely under oath is the "antithesis of judicial integrity," *In re James*, 492 Mich at 582 (MARKMAN, J., concurring in part and dissenting in part), the JTC concluded that a suspension for 180 days without pay would constitute a sufficient sanction. We respectfully disagree. We do not believe that such a sanction would sufficiently address the harm done to the integrity of the judiciary.[19] Indeed, just last term this Court held that testifying falsely under oath "is

---

[19] Although we ultimately agree with the examiner that a 180-day suspension constitutes an insufficient sanction under the instant circumstances and that this Court possesses the authority to remove respondent from office even though the JTC only recommended the suspension, see MCR 9.225, we question the examiner's authority to argue before this Court that we should impose a sanction other than the one recommended by the JTC.

21

entirely incompatible with judicial office and warrants removal." *In re Justin*, 490 Mich 394, 419; 809 NW2d 126 (2012). The "act of lying under oath categorically renders [a judge] unfit for office." *Id.* at 424.

> "Our judicial system has long recognized the sanctity and importance of the oath. An oath is a significant act, establishing that the oath taker promises to be truthful. As the "focal point of the administration of justice," a judge is entrusted by the public and has the responsibility to seek truth and justice by evaluating the testimony given under oath. When a judge lies under oath, he or she has failed to internalize one of the central standards of justice and becomes unfit to sit in judgment of others.

> Certainly, Judicial Tenure Commission proceedings are intended to be remedial, not penal. The vast majority of misconduct found by the Judicial Tenure Commission is not fatal; rather, it reflects oversight or poor judgment on the part of a fallible human being who is a judge. However, some misconduct, such as lying under oath, goes to the very core of judicial duty and demonstrates the lack of character of such a person to be entrusted with judicial privilege.

> . . . Lying under oath, as the respondent has been adjudged to have done, makes him unfit for judicial office." [*Id.* at 424, quoting *In re Noecker*, 472 Mich at 17-18 (YOUNG, J., concurring).]

---

MCR 9.202(G)(2)(a) expressly states that the examiner "shall not be present during the deliberations of the commission or participate in any other manner in the decision to file formal charges or to *recommend action by the Supreme Court* with regard to that judge[.]" (Emphasis added.) Although MCR 9.215 allows the examiner to file with the JTC a "statement of objections to the report of the *master*," we are unaware of any provision that allows the examiner to file with this Court a statement of objections to the *JTC*'s recommendation. (Emphasis added.) MCR 9.224(A) provides that the respondent may file with this Court "a petition to reject or modify the commission's recommendation," and MCR 9.224(B) provides that, if such a petition is filed with this Court, the commission must file with this Court "a brief supporting its finding." It says nothing about the examiner filing with this Court a brief supporting his personal objections to the commission's recommendation. Instead, it appears that after the JTC has made its findings and its recommendation and the respondent has filed a petition to reject or modify the commissioner's recommendation, the role of the examiner is to represent the JTC before this Court.

"Judges occupying the watchtower of our system of justice, should preserve, if not uplift, the standard of truth, not trample it underfoot or hide in its shady recesses." *In re Ferrara*, 458 Mich at 372. "The effectiveness of our judicial system is dependent upon the public's trust." *Id.* When a judge lies under oath, the public's trust and confidence in the judiciary is seriously eroded. *In re Noecker*, 472 Mich at 13; *In re Ferrara*, 458 at 364 ("When a judge's character and morals come into question not only do the people lose respect for him as a person, but worse, respect for the Court over which he presides is lost as well."). (Quotation marks and citation omitted.)

"The most fundamental premise of the rule of law is that equivalent misconduct should be treated equivalently." *In re Brown*, 461 Mich at 1292. "[U]nexplained disparities in punishment cannot be countenanced by a system with hopes of maintaining the public's faith in its just and fair administration." *Id.* at 1293. This Court has consistently imposed the most severe sanction by removing judges for testifying falsely under oath. See *In re Ryman*, 394 Mich 637, 642-643; 232 NW2d 178 (1975); *In re Loyd*, 424 Mich 514, 516, 535-536; 384 NW2d 9 (1986); *In re Ferrara*, 458 Mich at 372-373; *In re Noecker*, 472 Mich at 3, 12-13; *In re Nettles-Nickerson*, 481 Mich 321, 322; 750 NW2d 560 (2008);[20] *In re Justin*, 490 Mich at 396-397; *In re James*, 492 Mich at

---

[20] See also *In re Servaas*, 484 Mich 634, 702; 774 NW2d 46 (2009) (MARKMAN, J., dissenting) ("Because respondent engaged in a prolonged and deliberate effort to mislead [the Supreme Court Administrative Office], the master, the JTC, and this Court . . . including and especially testifying falsely under oath, I believe the JTC has reasonably concluded that respondent should be removed from office."), an opinion joined by three justices. The majority did not express disagreement concerning the propriety of removing a judge from office for lying under oath, but rather disagreed with the minority that the respondent had been shown to be lying in this case.

568-570.[21]  Because we can discern no compelling reason to treat this case any differently, and because testifying falsely under oath is "antithetical to the role of a Judge who is sworn to uphold the law and seek the truth," *In re Ferrara*, 458 Mich at 369 (quotation marks and citation omitted), and also because respondent has not demonstrated any apparent remorse for her misconduct and continues to deny responsibility for her actions, we believe that the only proportionate sanction is to remove respondent from office.

## IV.  CONCLUSION

We remove respondent from judicial office because we find removal necessary to restore and maintain the dignity and honor of the judiciary and, most importantly, to protect the public.  In addition, because respondent engaged in conduct involving "deceit or intentional misrepresentation," pursuant to MCR 9.205(B), we order respondent to pay costs of $8,498.40 to the JTC.  Pursuant to MCR 7.317(C)(3), the clerk is directed to issue the judgment order forthwith.

> Stephen J. Markman
> Robert P. Young, Jr.
> Mary Beth Kelly
> Brian K. Zahra
> David F. Viviano

---

[21] The only arguable exception of which we are aware is *In re Thompson*, 470 Mich 1347; 682 NW2d 477 (2004), in which the JTC and respondent reached a plea agreement for a 90-day suspension despite the complaint having included a generalized allegation that respondent had "demonstrated a lack of candor" before the JTC.

24

STATE OF MICHIGAN

SUPREME COURT

*In re* Honorable DEBORAH ROSS                                No. 144985
ADAMS, Judge 3rd Circuit Court

_____

MCCORMACK, J. (*concurring in part, dissenting in part*).

Respondent Judge Deborah Ross Adams engaged in conduct in her own tumultuous divorce proceedings that was inappropriate for any litigant, much less a judicial officer. The majority agrees with and adopts the factual findings and conclusions of law of the Judicial Tenure Commission (JTC), as well as the JTC's assessment of the controlling *Brown* factors.[1] Despite that, the majority rejects the JTC's recommended sanction of a 180-day suspension without pay, and has instead imposed the harshest sanction available, ordering that respondent be removed from office. I concur in all aspects of the majority's careful opinion, with the exception of its analysis of the appropriate sanction in section III(C), from which I dissent.[2]

I agree with the majority that the JTC thoroughly and reasonably applied the *Brown* factors in this case. During the JTC proceedings, the examiner urged the JTC to recommend removal as the appropriate sanction, but the nine commissioners of the JTC

_____

[1] *In re Brown*, 461 Mich 1291, 1292-1293; 625 NW2d 744 (2000).

[2] While I dissent from section III(C), I share the majority's concern about the propriety of the JTC examiner's conduct before this Court, as expressed in footnote 19 of the majority opinion.

unanimously determined that the sanction of a 180-day suspension without pay was adequate to address respondent's misconduct in this case. The JTC reasonably concluded that only five out of the seven *Brown* factors indicated that respondent's misconduct was more serious. I think it is also significant that the JTC concluded that respondent's actions were not part of a pattern or practice throughout her judicial career. Respondent's misconduct was not isolated to a single incident, but it was isolated in the sense that all of respondent's misconduct arose out of her personal divorce proceedings. It is clear from the record that those proceedings were contentious and emotionally difficult. Further, and not least of all, there is no allegation that respondent's misconduct carried over to the performance of her duties as a judicial officer. These facts do not justify or excuse respondent's misconduct in any way, but they do indicate that it is unlikely respondent will engage in similar misconduct in the future, or that her misconduct will infect the performance of her judicial duties, especially after enduring a 180-day suspension and the public proceedings in this case.

For all these reasons, and considering the entire factual context of this case,[3] I am not persuaded that the JTC's unanimous recommendation that respondent be suspended for 180 days without pay is inadequate to serve the purposes of judicial discipline.[4]

---

[3] See *In re Kapcia*, 389 Mich 306, 311; 205 NW2d 436 (1973) (noting that Const 1963, art 6, § 30 contemplates that the JTC and this Court will make individualized determinations on the entire factual context).

[4] See *In re Chrzanowski*, 465 Mich 468, 487-488; 636 NW2d 758 (2001), citing *In re Hocking*, 451 Mich 1, 24; 546 NW2d 234 (1996); *Matter of Mikesell*, 396 Mich 517, 527; 243 NW2d 86 (1976).

Thus, I would accord the JTC's recommendation considerable deference,[5] and adopt its recommended sanction.

Bridget M. McCormack
Michael F. Cavanagh

---

[5] See *In re Brown*, 461 Mich at 1293; *Chrzanowski*, 465 Mich at 488. I agree with the majority that this Court is not bound by the JTC's recommendations but it is not clear to me in this case why we should replace the JTC's recommendation of 180 days with removal. If a lengthier suspension would be more appropriate, there is a lot of ground between 180 days and removal.