GRAND RAPIDS TRUST CO. *v.* BELLOWS.

1. GIFTS—CAUSA MORTIS—INTER VIVOS—DISTINCTION.
   The distinguishing features between gifts *causa mortis*
   and *inter vivos* are that in the latter the gift is uncon-
   ditional, intended to become effective at once, and is not
   revocable by the donor.

2. SAME—INTER VIVOS—ELEMENTS NECESSARY.
   To constitute a gift *inter vivos* there must be a donor com-
   petent to make it, freedom of will on his part, and an
   intention on his part to make it.

3. SAME—EXECUTORS AND ADMINISTRATORS—COMPETENCY OF DONOR.
   In a suit by an administrator of a father's estate to set
   aside the transfer of certain certificates of deposit to his
   son two days before the father's death, on the ground of
   mental incompetency and undue influence, testimony that
   deceased had expressed an intention to favor said son
   in the disposition of his property, while furnishing a
   motive for the transfer, *held*, to in no way rebut the proof
   of deceased's mental incompetency at the time he in-
   dorsed the certificates.

4. ATTORNEY AND CLIENT—EVIDENCE—PRIVILEGED COMMUNICATIONS
   —WAIVER.
   Communications made by a client to his attorney are
   privileged unless waived by the client and after his death
   the privilege may be waived by his representative.

5. GIFTS — EVIDENCE — MATERIALITY—COMPETENCY OF DONOR—AT-
   TORNEY AND CLIENT.
   Where there was a marked change in deceased's physical
   condition between the 11th, when his attorney last saw
   him, and the 15th, when the certificates were indorsed,
   the question of the competency of the attorney to testify
   as to deceased's mental competency to transact business
   becomes immaterial.

6. SAME—EVIDENCE—SUFFICIENCY.
   Evidence *held*, sufficient to support the decree of the court
   below in favor of plaintiff.

On presumption and burden of proof as to undue influence
respecting gifts *inter vivos* from parent to child, see note in
35 L. R. A. (N. S.) 944.

For authorities discussing the question of admissibility in
evidence of privileged communications, see note in 67 L. R. A.
923.

Appeal from Kent; Dunham (Major L.), J.   Submitted June 15, 1923.   (Docket No. 86.)   Decided October 1, 1923.

Bill by the Grand Rapids Trust Company, administrator of the estate of Dennis Bellows, deceased, against Rolland Bellows and another to set aside a transfer of certain certificates of deposit.   From a decree for plaintiff, defendants appeal.   Affirmed.

*Willis B. Perkins, Jr.,* for plaintiff.

*Lombard & Atkinson,* for defendants.

SHARPE, J.   Dennis Bellows, long a resident of Rockford, in Kent county, died in the hospital at Ann Arbor on May 17, 1922.   On the 15th, he indorsed certain certificates of deposit, totaling $4,000, to his son, the defendant Rolland Bellows.   The plaintiff, as administrator of his estate, filed the bill of complaint herein, alleging that the transfer of the certificates had been procured while deceased was mentally incompetent and by undue influence, and praying that it be set aside and said certificates, or the proceeds thereof, be decreed to be the property of the estate. From a decree granting such relief, the defendants Rolland Bellows and Winifred Bellows, his wife, appeal.

The trial court filed an opinion in which he quotes from and comments upon the evidence at length.   He reached the conclusion that the indorsements of the certificates by the deceased were procured as charged in the bill, that no title passed to Rolland thereby, and that the proceeds thereof were the property of the estate.

The deceased for some time prior to his death had been suffering from pulmonary tuberculosis and tuberculosis of the kidneys.   In April, 1922, he went to Ann Arbor and entered the University hospital for

treatment.    At first he roomed outside the hospital, but about May 1st he was confined therein.    On the 10th he was put on the list of patients "dangerously ill" and his relatives notified that he was "liable to die."    On the 13th he was transferred from the surgical to the medical ward.    The doctor in charge of that ward testified—

"he was so weak I think I might say that he could not sit up in bed to allow a physical examination of his chest."

He also testified that—

"during the 15th and 16th he showed periods when it would be quite difficult to arouse him and on numerous occasions he became somewhat hallucinated."

He expressed the opinion, based on his observations and the condition as revealed by the hospital records, that deceased "was in no condition to transact business of any importance" on the morning when the certificates were signed.    Mrs. Good, a nurse in attendance, testified:

"He seemed stuporous when he first came in the ward, but it grew worse as he was there longer; * * * he had hallucinations and deranged conditions of mind when he was there in the ward."

She further testified:

"Q. In your attendance upon him, did you have to talk to him?
"A. He had to be aroused and argued with.
"Q. Could you make him understand what you were telling him?
"A. Sometimes he seemed to understand but you were never certain.    Sometimes he would not even take his medicine that was given to him.
"Q. You were never certain, you say, that he understood what you said?
"A. No, sir.
"Q. And you say that he had to be aroused to give him his medicine?

"*A.* Yes, sir.

"*Q.* When did that condition commence?

"*A.* Well, the afternoon of the 13th.

"*Q.* And did that continue continuously throughout the time he was there in the ward?

"*A.* He grew worse.

"*Q.* And it grew worse continuously and that condition of affairs was sustained on the morning of the 15th of May, was it?

"*A.* I don't remember, but I know that he had to be aroused to have his temperature taken at 8 o'clock.

"*Q.* The morning of the 15th, and you say the condition grew constantly worse from the time he came until the time he died?

"*A.* Yes, sir."

On the 15th his condition was such that food was administered to him through the rectum by what is known as a "Murphy drip." During the twelve hours before the indorsements were made, his temperature had steadily declined and his pulse and respiration had taken a marked drop. On the 11th, his wife, his son Rolland and his daughter Nathalie, having been apprised of his condition, came from their homes at Rockford to the hospital to see him. His daughter Arline, who was in school at Kalamazoo, arrived before them. The deceased refused to see his wife, but the others saw him and remained until the following day, when they all returned to their homes The record does not disclose any private interview between Rolland and his father at that time. Rolland returned on the 14th late at night and saw his father but a moment. He returned to the hospital the next morning about 8 o'clock. A screen was placed around the bed in which the father lay. Arline, who had returned from Kalamazoo, came in at this time and asked what they were doing. Rolland testified that he stepped outside and—

"told her father had some business he wanted to attend to,"—

and he suggested that she had better go upstairs to the waiting room and she did so. Arline testified that Rolland told her their father was going to make a will and that soon after, when she inquired if he had done so, Rolland said—

"the nurse said that dad was unable to make a will at that time."

The only person present besides Rolland at the time the indorsements were made was a nurse named Armstrong. Her testimony was taken by deposition. In substance she said that when she and Rolland went to his bedside deceased seemed very weak and had to be aroused out of a stupor; that they took the top off the stand and placed it on the bed; that Rolland took the papers out of his pocket and either he or she held them while they were being signed; that her attention was challenged by the persistence of Rolland to get the papers signed; that deceased seemed rational and she thought he knew he was signing his name. Her testimony is somewhat weakened by the fact that some time previous she had made an affidavit in which she said that—

"deceased was so weak at the time said papers were signed that he had practically no will of his own; that said Rolland Bellows was persistent in procuring deceased's signature to all of said papers and that deponent believed when the papers were signed that the transaction would be questioned and that the signing was void and of no force and effect."

It does not appear that she overheard any conversation between Rolland and his father, except the request of the former that the latter should sign the papers.

There is no claim that any consideration passed to the deceased. Rolland's title, therefore, rests on the proof that by indorsement and delivery the certificates were given to him by his father. While his counsel suggest that the transaction "has many, if not all, of

the essential elements of a gift *causa mortis*," it is clearly apparent that the gift, if made, was unconditional, intended to become effective at once, and not liable to revocation by the donor.   These are the distinguishing features between gifts *causa mortis* and *inter vivos*.   28 C. J. p. 622.   The law as applied to the latter must therefore control.   To constitute such a gift there must be—

"a donor competent to make it; freedom of will on his part; an intention on his part to make it."   28 C. J. p. 626.

"To accomplish this an intelligent will directing or assenting to the act done was essential."   *Duncombe* v. *Richards*, 46 Mich. 166, 171.

In that case the facts surrounding the transaction were somewhat similar to those here presented.   It was further said:

"These assignments being made by Mr. Selleck while on his death-bed, in the absence of all his near relatives except the beneficiary himself, were naturally the subject of grave suspicion, and the circumstances justly, as we think, imposed upon the defendant the burden of making some showing of their fairness."

Many cases are cited to support this holding.

The determination in each case must of course rest on the facts established by the proofs.   It here appears that the relations between the deceased and his wife had become strained and that while he was at Ann Arbor she had begun a divorce proceeding against him.   It also appears that he had expressed to many of his neighbors an intention to favor Rolland in the disposition of his property and stated his reasons therefor.   These facts, while furnishing a motive for the transfer of the certificates, in no way tend to rebut the proof offered as to the mental condition of the deceased and his inability to fully understand what he was doing at the time the indorsements were made.

The record is barren of any proof as to where Rolland got the certificates, how he came to get them, or that the deceased when he signed his name knew what he was signing.    It appears that deceased at that time had other certificates of deposit.    It is unfortunate, indeed, that, if deceased expressed a desire and .intent to give these certificates to his son, competent proof thereof was not obtainable.    The testimony of the doctor and the nurses in attendance tends to establish the fact that deceased was not mentally in a condition to fully understand what he was doing.

The deceased, after service of process upon him in the divorce suit, retained Frank E. Jones, of Ann Arbor, to defend it and had had several conferences with him before his death.    The defense called Mr. Jones as a witness and sought to interrogate him as to what the deceased had said to him and also as to his mental condition.    The court declined to permit this on the ground that such communications were privileged.    To this ruling counsel excepted.    Section 12493, 3 Comp. Laws 1915, provides for the taking and return of testimony thus excluded.    This was not done.    It further provides:

"* * * if upon the hearing of such appeal, the Supreme Court shall be of the opinion that any such testimony is competent and material, it may order the same to be taken by deposition, or under a reference, and returned to said court."

What the deceased may have said to Mr. Jones as to any intended disposition of his property was, we think, clearly privileged.    We have statutes governing such communications made to ministers of the gospel (3 Comp. Laws 1915, § 12549) and to physicians (3 Comp. Laws 1915, § 12550), but no such provision as to an attorney.    The rule is thus stated in 5 Wigmore on Evidence (2d Ed.), § 2292:

"Where legal advice of any kind is sought from a

professional legal advisor in his capacity as such, the communications relevant to that purpose, made in confidence by the client, are at his instance permanently protected from disclosure by himself or by the legal advisor, except the client waives the protection."

The reason for the rule and its scope are discussed in the sections following. After the death of the client, the privilege may be waived by his representative. The rule does not apply to instructions given to an attorney for the preparation of a will, in a will contest (*In re Loree's Estate,* 158 Mich. 372, 377).

The effect of the transfer of the certificates here made was to deplete the estate to the amount of $4,000. We think the same rule should apply as though the deceased had sought to set aside the transfer during his lifetime. Had he done so, Mr. Jones would not have been permitted to testify unless the deceased had expressly waived the rule of law prohibiting him from doing so. It appears that the last time Mr. Jones talked to the deceased was on May 11th. The record discloses so marked a change in his physical condition between the 11th and the 15th, when the certificates were indorsed, that we deem it unnecessary to consider his competency to testify to facts bearing upon the mental condition of the deceased as, even if found to be competent, we should not deem it sufficiently material to order it taken and returned as provided for in the statute.

The conclusion reached by the trial court, while not binding upon us, is entitled to great weight. There was proof to support it, and after a careful reading of the entire record we feel constrained to affirm the decree based upon it. The plaintiff will recover costs.

WIEST, C. J., and MCDONALD, CLARK, BIRD, and MOORE, JJ., concurred. FELLOWS and STEERE, JJ., did not sit.