# Order

**Michigan Supreme Court**
**Lansing, Michigan**

June 15, 2018

154159

Stephen J. Markman,
Chief Justice

Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Kurtis T. Wilder
Elizabeth T. Clement,
Justices

TAMMY McNEILL-MARKS,
      Plaintiff-Appellee,

v

MIDMICHIGAN MEDICAL CENTER-
GRATIOT,
      Defendant-Appellant.

SC: 154159
COA: 326606
Gratiot CC: 14-011876-NZ

_____/

On April 12, 2017, the Court heard oral argument on the application for leave to appeal the June 16, 2016 judgment of the Court of Appeals. By order of July 7, 2017, the parties were directed to file additional supplemental briefs. On order of the Court, the supplemental briefs having been received, the application is again considered, and it is DENIED, because we are not persuaded that the questions presented should be reviewed by this Court.

ZAHRA, J. (*dissenting*).

I respectfully dissent from the majority's order denying leave in this case. This action arises from a claim brought under the Michigan Whistleblowers' Protection Act (WPA),[1] a law enacted to protect employees from adverse employment consequences that result from the employee's reporting of actual or suspected violations of law.[2] The issue presented in this case is whether an employee is reporting suspected illegal activity to a public body under MCL 15.362—a protected activity under the WPA—when that employee merely informs her private attorney about another person purportedly violating a personal protection order (PPO). The trial court granted summary disposition to defendant on the ground that plaintiff had not reported a suspected illegal activity to a public body under the WPA. The Court of Appeals reversed, holding that plaintiff's private attorney, as a mandatory member of the State Bar of Michigan, is a "public body." Following oral argument on defendant's application for leave to appeal, this Court ordered supplemental briefing on whether plaintiff's communication with her attorney amounted to a "report" under the WPA. I conclude that this communication is not a "report" based on the plain and ordinary meaning of that verb, particularly when it is considered within the context of the WPA and the sui generis nature of the attorney-

---

[1] MCL 15.361 *et seq*.

[2] 1980 PA 469, title.

client relationship.  Accordingly, I would reverse the judgment of the Court of Appeals and remand this case to the Court of Appeals for further proceedings.

## I.  FACTS AND PROCEEDINGS

Plaintiff Tammy McNeill-Marks began working for defendant MidMichigan Medical Center-Gratiot (MMCG) in February 2012.  Prior to this time, plaintiff had adopted two children and had a third child placed in her custody.  Each child has the same biological mother: Sandi Freeze, plaintiff's second cousin.  Marcia Fields, Freeze's mother and the children's biological grandmother, suffers from several psychiatric disorders.  After plaintiff took custody of the children, Fields began a pattern of threatening conduct toward plaintiff, which included threats to kill her and her adopted and biological children.  This behavior led plaintiff to seek multiple PPOs against Fields.

On January 14, 2013, the Gratiot Circuit Court entered an amended PPO that prohibited Fields from engaging in "stalking" as defined in MCL 750.411h and MCL 750.411i.  Fields continued to violate the PPO.  On December 27, 2013, plaintiff filed a motion through her attorney, Richard Gay, to extend the PPO.  The circuit court granted the motion ex parte.  The PPO prohibited the same conduct as the previous PPO and remained in effect until December 31, 2014.

While at work on January 13, 2014, plaintiff unexpectedly encountered Fields at MMCG.  Plaintiff said "hello" to a then-unknown person being transported down a hallway in a wheelchair.  The person responded, "Hello, Tammy" in what plaintiff described as "[a] little sing-songy voice" that plaintiff immediately recognized as Fields's voice.  Plaintiff testified that she did not know Fields was an inpatient at that time.  There was no further interaction between plaintiff and Fields at MMCG.

Plaintiff called her attorney, Richard Gay, after her encounter with Fields.  Plaintiff testified that she was only returning a missed call from Gay from over the weekend.  Plaintiff told Gay that "[Fields] showed up today at my workplace."  According to plaintiff, she did not tell Gay whether Fields was a patient at the hospital.  Likewise, plaintiff expressly told Gay not to serve Fields with the PPO at MMCG because she had previously been told by Fields's daughter at a funeral that Fields was "really, really ill" and would require heart surgery, which was also confirmed in her family members' Facebook posts.

Nevertheless, later that evening Fields was served with the PPO at MMCG.  According to plaintiff and Gay, Fields was served at MMCG as a matter of coincidence that bore no connection with plaintiff's encounter with Fields earlier that day.  Apparently, Gay's secretary happened to be at MMCG visiting another patient when she saw Fields there.  Gay's secretary had informed her boyfriend, Gay's process server,

about Fields's presence at MMCG. Gay's process server went to MMCG, asked for and received Fields's room number, and then served her with the PPO in her hospital room.

Fields reported the incident to defendant as a suspected violation of the Health Insurance Portability and Accountability Act of 1996 (HIPAA).[3] In reaction to Fields's HIPAA complaint, defendant began an investigation into plaintiff's conduct. Following defendant's investigation, its privacy officer concluded that plaintiff had violated HIPAA and defendant's internal privacy policies by "disclos[ing] that the patient [Fields] was . . . at the hospital," which was "protected health information." Plaintiff was terminated on February 14, 2014. The "Corrective Action and Disciplinary Form" cited plaintiff's telephone conversation with Gay as a "severe breach of confidentiality and violation[] of HIPAA privacy/practices" and as the reason for her termination.

Plaintiff brought the instant action against defendant, claiming that her termination violated the WPA and Michigan public policy. Following discovery, defendant moved for summary disposition under MCR 2.116(C)(10). The trial court granted defendant summary disposition as to both claims. With regard to the WPA claim, the trial court ruled in part that plaintiff's conversation with her attorney was not a report to a public body.[4] The trial court also ruled that plaintiff failed to demonstrate that defendant

---

[3] HIPAA is codified at 29 USC 1181 *et seq.*, 42 USC 300gg, and 42 USC 1320d *et seq.*

[4] The trial court also concluded that plaintiff could not reasonably have believed that her contact with Fields constituted a violation of the PPO.

In addition, in rebuttal to plaintiff counsel's argument at the motion for summary disposition hearing, defense counsel argued in part that:

> Your Honor, let's go back . . . a minute to what plaintiff told [defendant] she told her attorney, because I hear opposing counsel now trying to make the argument that the plaintiff's conversation with her attorney was something about contacting the court to enforce the PPO or something along those lines, that's entirely untrue and that's not consistent with plaintiff's testimony at all. What plaintiff told [defendant] with regard to that patient is, number one, that the patient was at the medical center. She also told her attorney that the patient was really sick and the rumor was she might not live, in that same conversation. And she also told her attorney, don't even bother serving the PPO, because I don't even know if I want to serve it any more. And she told [defendant] all of that. Somehow this conversation is now being twisted into something that's about enforcing a PPO and contacting the Court, etcetera, that is not how things happened at all. And, in fact, something like two days after plaintiff's conversation with her attorney, they did file a motion for contempt and nowhere in the motion for contempt is there even any mention of this encounter at Gratiot at all.

requested her to conceal or hide the existence of a crime in violation of public policy. Plaintiff appealed.

The Court of Appeals reversed the trial court's ruling regarding the WPA violation and remanded for further proceedings.[5] The panel held that plaintiff's phone call with attorney Gay regarding her encounter with Fields was a report to a public body and thus a protected activity under the WPA. The panel specifically stated that plaintiff's attorney, as a member of the State Bar of Michigan (SBM), was a member of a "public body" under MCL 15.361(d)(*iv*). The panel thus concluded that plaintiff presented sufficient evidence to establish a prima facie case under the WPA.[6] Defendant sought leave to appeal in this Court. We directed the Clerk of this Court to schedule oral argument on whether to grant the application or take other action.[7] Following oral argument on the application for leave to appeal, we directed the parties to file additional supplemental briefs addressing the following issues:

> [W]hether the communication from the plaintiff to her attorney regarding Marcia Fields's presence at MidMichigan Medical Center-Gratiot amounted to a "report," as that word is used in Section 2 of the Whistleblowers Protection Act (WPA), MCL 15.362. In answering this question, the parties shall, at a minimum, address whether: (1) the plaintiff's communication must be to an individual with the authority to address the alleged violation of law; (2) the WPA requires that a plaintiff employee specifically intend to make a charge of a violation or suspected

---

> That telephone conversation had nothing to do with serving—she—she told her lawyer, don't even bother serving it. It had nothing to do with reporting a violation of the law. It had nothing to do with enforcing the PPO. She just wanted—she had a conversation with her lawyer and she wanted to tell her lawyer that that woman was at the hospital. And based on the information she gave [defendant], [defendant] understood her to be saying that she told her lawyer, Marcia Fields was a patient at the hospital.

In deciding the motion, the trial court ostensibly rejected plaintiff's claim that her conversation with her attorney was "clear and convincing evidence" that plaintiff was "about to report" a violation to a court. See MCL 15.363(4).

[5] *McNeill-Marks v MidMichigan Med Ctr-Gratiot*, 316 Mich App 1, 6 (2016).

[6] With regard to plaintiff's public policy claim, the panel held that because this claim arose out of the same activity as her WPA claim, the WPA preempted the public policy claim.

[7] *McNeill-Marks v MidMichigan Med Ctr-Gratiot*, 500 Mich 931 (2017).

violation of law against another; and (3) privileged communications between a client and his or her attorney can constitute a report under the WPA.[8]

## II. STANDARD OF REVIEW

The interpretation of the WPA presents a statutory question that this Court reviews de novo.[9] We also review de novo a trial court's grant of summary disposition under MCR 2.116(C)(10).[10]

## III. ANALYSIS

The WPA states, in pertinent part:

> An employer shall not discharge . . . an employee . . . because the employee, or a person acting on behalf of the employee, reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body . . . .[11]

---

[8] *McNeill-Marks v MidMichigan Med Ctr-Gratiot*, 500 Mich 1031 (2017).

[9] *Pace v Edel-Harrelson*, 499 Mich 1, 5 (2016).

[10] *Lowrey v LMPS & LMPJ, Inc*, 500 Mich 1, 5 (2016).

[11] MCL 15.362. This Court has observed that a plaintiff employee must demonstrate the following to make a prima facie case that his or her defendant employer has violated the WPA:

> (1) The employee was engaged in one of the protected activities listed in the provision[;]

> (2) the employee was discharged, threatened, or otherwise discriminated against regarding his or her compensation, terms, conditions, location, or privileges of employment[; and]

> (3) A causal connection exists between the employee's protected activity and the employer's act of discharging, threatening, or otherwise discriminating against the employee. [*Wurtz v Beecher Metro Dist*, 495 Mich 242, 251-252 (2014).]

MCL 15.361(d) broadly defines the phrase "public body" as follows:

> (d) "Public body" means all of the following:
>
> (*i*) A state officer, employee, agency, department, division, bureau, board, commission, council, authority, or other body in the executive branch of state government.
>
> (*ii*) An agency, board, commission, council, member, or employee of the legislative branch of state government.
>
> (*iii*) A county, city, township, village, intercounty, intercity, or regional governing body, a council, school district, special district, or municipal corporation, or a board, department, commission, council, agency, or any member or employee thereof.
>
> (*iv*) *Any other body which is created by state or local authority or which is primarily funded by or through state or local authority, or any member or employee of that body.*
>
> (*v*) A law enforcement agency or any member or employee of a law enforcement agency.
>
> (*vi*) The judiciary and any member or employee of the judiciary.[12]

The Court of Appeals relied on Subparagraph (*iv*) to conclude that the SBM is a "public body" under the WPA. The panel then concluded that plaintiff's attorney, as a mandatory member of the SBM, is a member of a "public body." Assuming without deciding that plaintiff's attorney is a member of a "public body" under MCL 15.361(d)(*iv*),[13] this Court must consider whether plaintiff's communication with her private attorney was "reporting" under the WPA.

---

[12] Emphasis added.

[13] Defendant also argues that the SBM is not a "public body" under MCL 15.361(d)(*iv*). The definition of "public body" under MCL 15.361(d) must be read as a whole. Subparagraph (*i*) focuses on Michigan's executive branch. Subparagraph (*ii*) focuses on Michigan's legislative branch. Subparagraph (*iii*) applies to the municipalities and other local units of Michigan government. The first three subparagraphs focus on two of our three branches of state government (legislative and executive) along with reference to local government. Subparagraph (*iv*) is a catch-all definition. The use of a catch-all suggests that the *ejusdem generis* canon applies—where a general term follows a series of specific terms, the general term is interpreted "to include only things of the same kind,

## A. "REPORT" UNDER THE WPA

Statutory interpretation begins with an examination of the statutory text.[14]  We give the words used in a statute their ordinary meaning, unless the statute specifically defines a given term.[15]  When a statutory definition is provided, that definition controls over any ordinary or plain meaning that may otherwise apply to the term or phrase defined by statute.[16]  "The primary rule of statutory construction is that, where the

class, character, or nature as those specifically enumerated." *Neal v Wilkes*, 470 Mich 661, 669 (2004) (quotation marks and citation omitted).

The placement of Subparagraph (*iv*) within MCL 15.361(d) is significant. Subparagraph (*iv*)'s position is fourth of six enumerated subparts that define "public body."  The Legislature's placement of Subparagraph (*iv*) demonstrates that "[a]ny other body" must be read in association with the preceding three subparagraphs.  Further, because the catch-all provision is placed before the references in the final two subparagraphs to the judiciary and law enforcement agencies, the catch-all must be read as specifically not applying to either law enforcement agencies or the judiciary.  This placement is presumed intentional.

Assessing the similar association among the definitions of "public body" in Subparagraphs (*i*) through (*iii*) is not an easy task.  It may be argued that the public bodies referenced in Subparagraphs (*i*) through (*iii*) are state-created government entities or agencies whose primary purpose is the execution of government functions traditionally performed by state or local government, exclusive of law enforcement agencies and the judiciary.  The SBM is seemingly not such an entity.

The SBM does not perform traditional government functions.  The SBM's mission is to promote and improve the legal profession in Michigan.  These functions have a tangential beneficial impact on the general public and the administration of justice; however, they primarily pertain to legal services and the attorneys performing those legal services, which is traditionally a private endeavor related to the legal profession. Furthermore, a common thread among state or state-created government entities or agencies is that their activities are generally undertaken via public employees.  The SBM is not a public employer.  SBM employees are not paid through any government funding, but are paid from annual dues collected from licensed attorneys.  Executive officers of the SBM also do not receive compensation for their services.  Thus, a persuasive argument can be made that the SBM is not a "public body" under the WPA.

[14] *Lash v Traverse City*, 479 Mich 180, 187 (2007).

[15] MCL 8.3a; *People v Peals*, 476 Mich 636, 641 (2006).

[16] *Ligons v Crittenton Hosp*, 490 Mich 61, 81 (2011).

statutory language is clear and unambiguous, the statute must be applied as written."[17] "A necessary corollary of these principles is that a court may read nothing into an unambiguous statute that is not within the manifest intent of the Legislature as derived from the words of the statute itself."[18] When engaging in statutory interpretation, courts must construe the text as a whole.[19]

A statutory term or phrase cannot be read in isolation, but must be construed in accordance with the surrounding text and statutory scheme.[20] The WPA prohibits an employer from firing an employee "because the employee, or a person acting on behalf of the employee, *reports or is about to report* . . . a violation or a suspected violation of a law . . . to a public body . . . ."[21] The subject of this dependent clause is the whistleblower employee[22] or "a person acting on behalf of the employee" (discussed more below). At issue here, the Legislature uses the term "report" as a transitive verb, which means something must be reported.[23] That something—a direct object—is "a violation or suspected violation of a law" (for short, the "illegality"). The illegality, as a direct object, provides meaning to the verb "report." The receiver of the reported illegality—an indirect object—is a "public body" defined under MCL 15.361(d). The

---

[17] *Cruz v State Farm Mut Auto Ins Co*, 466 Mich 588, 594 (2002).

[18] *Roberts v Mecosta Co Gen Hosp*, 466 Mich 57, 63 (2002).

[19] *Sweatt v Dep't of Corrections*, 468 Mich 172, 179 (2003) (opinion by MARKMAN, J.); see also Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (St. Paul: Thomson/West, 2012), p 167 ("Perhaps no interpretative fault is more common than the failure to follow the whole-text canon, which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts.").

[20] *Breighner v Mich High Sch Athletic Ass'n, Inc*, 471 Mich 217, 232 (2004).

[21] MCL 15.362 (emphasis added).

[22] A "whistleblower" is "[a]n employee who reports employer wrongdoing to a governmental or law-enforcement agency," *Black's Law Dictionary* (10th ed), or "one who reveals something covert or who informs against another," *Merriam-Webster's Collegiate Dictionary* (11th ed).

[23] A "transitive verb" is "[a] verb that requires a direct object to complete its meaning[.]" Strunk & White, *The Elements of Style* (4th ed), p 95. "A verb that requires an object to express a complete thought; the verb indicating what action the subject exerts on the object." Garner, *Garner's Modern American Usage* (New York: Oxford University Press, 2009), p 922.

Legislature's express designation of a "public body" as the receiver of the reported illegality presumes that the governmental entity can address or cure the illegality through some governmental function.

The term "report" is undefined in the WPA and, accordingly, must be interpreted in light of its context within the WPA. If a statute does not define a term, it is appropriate to consult dictionary definitions to determine the plain and ordinary meaning of the term.[24] The term "report"—like most words in the English language—is polysemous. For illustration, a dictionary contemporaneous with the WPA's enactment provides 13 definitions of the verb "report" (both transitive and intransitive).[25] The multitude of meanings for "report" underscores the importance of reading "report" in the context of the WPA. Reading the WPA as a whole, the most pertinent definitions of the verb "report" are "to denounce to a person in authority"[26] or "to make a charge of misconduct against."[27] These definitions comport with the sentence structure of MCL 15.362: the whistleblower employee (subject) must *report* (transitive verb) an illegality (direct object) to a public body (indirect object). Thus, the ordinary meaning of "report" under the WPA requires that the whistleblower employee intend to denounce an illegality or make a charge of misconduct to a "public body."

The Court of Appeals failed to give meaning to the term "report" under the WPA. The panel assumed that plaintiff's communication with her attorney was reporting. "It is undisputed that Gay was a licensed Michigan attorney and a member in good standing of the [SBM] when plaintiff called him and reported her contact with Fields."[28] But an employee that simply *communicates* an illegality to a person falling under the broad definition of "public body" has not engaged in protected activity under the WPA. Giving the term "report" such broad meaning would ignore the textual requirements for a protected activity and would not further the purported purposes of the WPA. The WPA

---

[24] *Epps v 4 Quarters Restoration LLC*, 498 Mich 518, 529 (2015).

[25] See *Webster's New Twentieth Century Dictionary: Unabridged* (1979). Most definitions of the verb "report" are clearly not applicable here. For example, "report" is broadly defined as "to give an account of, often at regular intervals; to give information about, as something seen or investigated; to say" or "to carry and repeat (a message, etc.)." The term "report" also applies specifically to the media, such as "to write an account of for presentation to others or for publication, as in a newspaper" or "to tell or relate from one to another; to circulate publicly, as a story . . . ." *Id*.

[26] *Webster's New Twentieth Century Dictionary: Unabridged* (1979).

[27] *Webster's Ninth New Collegiate Dictionary* (1983).

[28] *McNeill-Marks*, 316 Mich App at 22.

contains no textual basis for adopting the broadest definition for the undefined term "report."[29]

Other Court of Appeals panels have properly given meaning to "report" under the WPA. In *Henry v Detroit*,[30] the Detroit Police Department formed a review board to investigate the highly publicized death of Malice Green. The department's internal policy defined the role and obligations of the board, but the police chief gave orders effectively precluding the board from performing its obligations. The plaintiff police commander gave deposition testimony in a civil suit brought by another officer that the board was not allowed to perform its obligations. Shortly thereafter, the plaintiff was given the "choice" of either a demotion or taking an early retirement. The plaintiff brought a WPA action against the city and the police chief, in which the jury found that the defendants had retaliated against the plaintiff for his deposition testimony. The *Henry* panel, characterizing the plaintiff as a "type 1 whistleblower,"[31] stated: "On the basis of the plain language of the WPA, we interpret a type 1 whistleblower to be one who, on his own initiative, takes it upon himself to communicate the employer's wrongful conduct to a public body in an attempt to bring the, as yet hidden, violation to light to remedy the situation or harm done by the violation. In other words, we see type 1 whistleblowers as initiators . . . ."[32] The panel held that the plaintiff's deposition testimony was not a report because the plaintiff "took no initiative to communicate the violation to a public body" and "was deposed in a private civil suit previously filed by a fellow officer."[33]

---

[29] Plaintiff's counsel at oral argument on the application argued that when the Legislature does not define a term, courts must read the term in its broadest possible sense. I firmly reject this argument because it ignores that courts must construe text as a whole and give meaning to undefined terms at issue in context of the statutory language. "We do not . . . construe the meaning of statutory terms in a vacuum." *Tyler v Cain*, 533 US 656, 662 (2001).

[30] *Henry v Detroit*, 234 Mich App 405, 407 (1999).

[31] Michigan WPA jurisprudence often characterizes the whistleblower employee as either a "type 1" or "type 2" whistleblower depending on the alleged protected activity. These distinctions may be helpful shorthand, but courts must always return to the express language under MCL 15.362. See *Wurtz*, 495 Mich at 251 n 14 (discussing the danger of courts relying on the judicially created term "adverse employment action" for WPA claims).

[32] *Henry*, 234 Mich App at 410.

[33] *Id*. at 411.

Another illustrative case is *Hays v Lutheran Social Servs of Mich*.[34]  The plaintiff employee worked as a home-healthcare provider.  During her work, the plaintiff encountered a client that smoked marijuana in his home and within her presence.  The plaintiff called the police inquiring about potential criminal consequences of failing to disclose another person's illegal drug use.  When the police asked if she wanted to take any action, the plaintiff declined to do so.  She was subsequently fired by her employer for violating her client confidentiality agreement.  The *Hays* panel held that the plaintiff's communication with the police was not "reporting" under the WPA.  The panel used the dictionary definition of the noun "report," which is " 'a detailed account of an event, situation, etc., [usually] based on observation or inquiry.' "[35]  The panel analyzed the plaintiff's communication as follows:

> [P]laintiff called the . . . officer to inquire about her potential liability if Client A's behavior was discovered, not to report any illegal behavior. Plaintiff did not provide any particulars or otherwise convey information that could have assisted the . . . officer in actually investigating any wrongdoing.  There is no evidence that plaintiff identified herself, Client A, or Client A's location, nor did she provide any sort of detailed account of the situation.  She did not even appear to specify the type of "illegal drugs" at issue.  Thus, rather than providing a "detailed account of an event, situation, etc.," plaintiff was merely seeking to obtain information and advice.  [*Hays*, 300 Mich App at 60.]

Although it erred by using the nounal definition of "report," the panel correctly examined the meaning of "report."  Specifically, the panel understood that a whistleblower employee's communication with a public body is not enough for reporting an illegality under the WPA.  These illustrative cases support my conclusion that "report" under the WPA requires that the whistleblower employee intend to denounce an illegality or make a charge of misconduct to a "public body."

### B.  APPLICATION TO PLAINTIFF'S PRIVATE ATTORNEY

I now consider whether plaintiff's communication with her private attorney was "reporting" under the WPA.  The facts are particularly unique as the sole communication

---

[34] *Hays v Lutheran Social Servs of Mich*, 300 Mich App 54 (2013).

[35] *Hays*, 300 Mich App at 59, quoting *Random House Webster's College Dictionary* (2005), and citing *People v Holley*, 480 Mich 222, 228 (2008) (holding that the prosecutor need not prove beyond a reasonable doubt that the crime sought to be reported was attempted or committed by another person in order to obtain a conviction for preventing or attempting to prevent the report of a crime under MCL 750.483a(1)(b)).

at issue involves an attorney-client communication. Plaintiff relies on the phone call with attorney Gay regarding her encounter with Fields at MMCG as her alleged protected activity.[36] This communication was defendant's stated reason for firing plaintiff. The Court of Appeals failed to appreciate the sui generis nature of the attorney-client relationship, specifically within the WPA context.

The WPA expressly allows "a person acting on behalf of the employee" to report an illegality.[37] A whistleblower employee alleging that she was about to report an illegality must show by "clear and convincing evidence that . . . she *or a person acting on . . . her behalf* was about to report . . . ."[38] The Legislature's inclusion of "a person acting on behalf" of the whistleblower employee sets forth an agency relationship. An agency relationship in its broadest sense includes every relation in which an agent acts for or represents a principal by his authority.[39] A "principal" is the person represented by an agent and on whose behalf the latter acts.[40] An "agent" is a person having express or implied authority to represent or act on behalf of another person, who is called his or her

---

[36] Plaintiff alleged in her complaint that having her attorney report on her behalf Fields's alleged violation of the PPO to the Gratiot Circuit Court was a protected activity under the WPA. Plaintiff made this argument in her appellant brief before the Court of Appeals. The Court of Appeals declined to rule on this issue, finding that plaintiff's communication with her private attorney was a protected activity. Plaintiff has not appealed this ruling or otherwise pursued this argument before this Court, and thus, plaintiff has abandoned such argument. I nevertheless would reject plaintiff's argument that she reported or was about to report the alleged violation of the PPO by filing in the circuit court. Plaintiff's motion for contempt, filed three days after her encounter with Fields at MMCG, was silent regarding this alleged violation. Further, plaintiff was not fired, and did not suffer any other adverse employment action, for filing a motion in the circuit court. Plaintiff additionally cannot establish a "causal connection" between filing her motion in the circuit court and her termination. Plaintiff has argued, and the Court of Appeals agreed, that her phone call with Gay was direct evidence of her termination.

[37] MCL 15.362.

[38] MCL 15.363(4) (emphasis added).

[39] *St Clair Intermediate Sch Dist v Intermediate Ed Ass'n/Mich Ed Ass'n*, 458 Mich 540, 557 (1998).

[40] *Stephenson v Golden (On Rehearing)*, 279 Mich 710, 734 (1937).

principal.[41]  "[F]undamental to the existence of an agency relationship is the right to control the conduct of the agent with respect to the matters entrusted to him."[42]

The whistleblower employee (principal) may satisfy the protected activity requirement by allowing her agent to report an illegality to a "public body" defined under MCL 15.361(d).  This arrangement involves three actors: (1) the whistleblower employee; (2) the whistleblower's agent; and (3) a "public body."  To demonstrate this protected activity, the whistleblower employee must communicate the illegality to her agent.  The whistleblower's agent then, acting on behalf of the employee, must report the illegality to a "public body."  Thus, a whistleblower employee's communication with her agent itself does not constitute reporting to a public body under the WPA.

The attorney-client relationship is generally governed by agency law.[43]  The legal definition of "attorney" is "one who is designated to transact business for another; a legal agent."[44]  An attorney (agent) acts on behalf of the client (principal), representing the client, with consequences that bind the client.  "A lawyer is an agent, to whom clients entrust matters, property, and information, which may be of great importance and sensitivity, and whose work is usually not subject to detailed client supervision because

---

[41] See *Burton v Burton*, 332 Mich 326, 337 (1952), quoting *Stephenson*, 279 Mich at 734.

[42] *St Clair Intermediate*, 458 Mich at 557-558 (citations omitted).

[43] *Link v Wabash R Co*, 370 US 626, 633-634 (1962) (affirming the district court's dismissal of the action when the petitioner's lawyer failed without reasonable excuse to appear for pretrial conference and noting that "[p]etitioner voluntarily chose this attorney as his representative in the action, and he cannot now avoid the consequences of the acts or omissions of this freely selected agent"); *New York v Hill*, 528 US 110, 114-115 (2000) (holding that defense counsel, as the defendant's agent, could waive the defendant's right to trial within a statutory period, even without the defendant's express consent); *Detroit v Whittemore*, 27 Mich 281, 286 (1873) ("The employment of counsel does not differ in its incidents, or in the rules which govern it, from the employment of an agent in any other capacity or business."); *People v Carter*, 462 Mich 206, 218 (2000) ("[T]he defendant is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney.") (quotation marks and citation omitted); *AMCO Builders & Developers, Inc v Team Ace Joint Venture*, 469 Mich 90, 103 (2003) (YOUNG, J., concurring) ("The attorney-client relationship is generally governed by principles of agency."); *People v Dendel*, 481 Mich 114, 137 (2008) (CORRIGAN, J., concurring) ("[L]awyers are *agents*, after all . . . .") (quotation marks and citation omitted).

[44] *Black's Law Dictionary* (10th ed); see also *Fletcher v Bd of Ed of Sch Dist Fractional No 5*, 323 Mich 343, 348 (1948).

of its complexity."[45]   In civil cases, a client is bound by an attorney's actions and omissions as long as the attorney's conduct falls within the scope of the attorney's authority.[46]  An attorney acting outside the scope of his authority may open himself up to civil liability and professional sanctions.  Agency law imparts many duties that an agent owes a principal.  But attorneys are held to a higher standard and thus have heightened duties compared to the ordinary agent.[47]  One of the fundamental, heightened duties for an attorney is protecting a client's confidential information.

Rules for client confidentiality derive from professional regulations, the attorney-client privilege, and the work-product doctrine.[48]  "The professional right and duty to preserve client confidences is a distinctive feature of the lawyer's function."[49]  The Michigan Rules of Professional Conduct (MRPC) provide great protection for a client's or a prospective client's communications with an attorney.[50]  Thus, an attorney is

---

[45] 1 Restatement Law Governing Lawyers, 3d, Introductory Note, p 124; see also Restatement Agency, 2d, § 14, comment *b*, p 60 (characterizing lawyers as "recognized agents").

[46] See *Everett v Everett*, 319 Mich 475, 482-483 (1947).

[47] See, e.g., DeMott, *The Lawyer as Agent*, 67 Fordham L Rev 301 (1998) (opining that the agency law principles are the starting point for analyzing the full legal consequences of attorney-client relationships).

[48] MRPC 1.6, comment ("The principle of confidentiality is given effect in two related bodies of law, the client-lawyer privilege (which includes the work-product doctrine) in the law of evidence and the rule of confidentiality established in professional ethics."). The work-product doctrine is not applicable here because plaintiff's phone call to attorney Gay was not "notes, working papers, memoranda or similar materials" prepared in anticipation of litigation.  *D'Alessandro Contracting Group, LLC v Wright*, 308 Mich App 71, 77 (2014) (quotation marks and citation omitted).

[49] 1 Hazard, Jr. & Hodes, *The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct* (Prentice Hall Law & Business, 2d ed), § 1.6:102.

[50] "[A] lawyer shall not knowingly: reveal a confidence or secret of a client; use a confidence or secret of a client to the disadvantage of the client; or use a confidence or secret of a client for the advantage of the lawyer or of a third person, unless the client consents after full disclosure."  MRPC 1.6(b) (subpart numbers omitted).  MRPC 1.6(a) defines "confidence" as "information protected by the client-lawyer privilege under applicable law" and defines "secret" as "other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client."

prohibited from disclosing confidential information except as authorized by law or required under the MRPC. An attorney's duty of confidentiality continues even after the attorney-client relationship has terminated.[51] "A lawyer is impliedly authorized to make disclosures about a client when appropriate in carrying out the representation, except to the extent that the client's instructions or special circumstances limit that authority."[52]

Consistent with the MRPC, the attorney-client privilege protects confidential client communications. The attorney-client privilege is one of the oldest and well-recognized privileges for confidential communications.[53] Michigan jurisprudence has long recognized the common-law attorney-client privilege.[54] The attorney-client privilege protects confidential communications between a client and her attorney made for the purpose of obtaining or giving legal advice.[55] "The purpose of the attorney-client privilege is to foster open communications between attorney and client. The privilege is personal to the client and cannot be waived by the attorney without the client's permission."[56] The Michigan Rules of Evidence provide for the attorney-client privilege.[57] The Legislature has expressly provided for the privilege in criminal proceedings.[58] The Supreme Court of the United States has recognized the common-law

---

[51] MRPC 1.9.

[52] MRPC 1.6, comment.

[53] *Upjohn Co v United States*, 449 US 383, 389 (1981).

[54] *Passmore v Passmore Estate*, 50 Mich 626, 627 (1883) ("There is a privilege of secrecy as to what passes between attorney and client, but it is the privilege of the client and he may waive it if he so chooses. It is not the privilege of the court or of any third party.") (citations omitted); *Grand Rapids Trust Co v Bellows*, 224 Mich 504, 510-511 (1923) ("Where legal advice of any kind is sought from a professional legal advisor in his capacity as such, the communications relevant to that purpose, made in confidence by the client, are at his instance permanently protected from disclosure by himself or by the legal advisor, except the client waives the protection.") (quotation marks and citation omitted).

[55] See *In re Adams*, 494 Mich 162, 174 n 12 (2013), quoting *Schaibly v Vinton*, 338 Mich 191, 196 (1953), and *Alderman v People*, 4 Mich 414, 423 (1857).

[56] *People v Nash*, 418 Mich 196, 219 (1983) (opinion by BRICKLEY, J.) (citation omitted).

[57] MRE 501 ("Privilege is governed by the common law, except as modified by statute or court rule.").

[58] See MCL 767.5a(2) ("Any communications between attorneys and their clients . . . are hereby declared to be privileged and confidential when those communications were

understanding that the attorney-client privilege survives the client's death.[59] In sum, the attorney-client privilege provides great protection for a client's confidential communications, unlike ordinary disclosures. For this reason, I cannot conclude that a whistleblower employee's communication with her agent itself constitutes reporting to a public body under the WPA.

The Court of Appeals failed to consider whether plaintiff's phone call with attorney Gay was a privileged communication. A privileged communication between a client and her private attorney cannot mean "reporting" to a public body under the WPA. There must be a waiver of the attorney-client privilege. As stated, the privilege belongs to the client, and thus the client must waive the privilege unless the law provides otherwise. The client may either expressly waive her privilege or implicitly waive her privilege through her conduct. Further, even if the client waives her privilege and consents to disclosing the confidential communication, the attorney's remedial actions are no different from the client under the WPA. The attorney must still *report* an illegality to a "public body" under the WPA. No matter the attorney's role as "an officer of the court," the private attorney must act as his client's agent within the scope of his authority. Such reasoning is consistent with the Legislature's express provision that "a person acting on behalf of the employee" may report an illegality for the whistleblower employee. For these reasons, privileged communications between a client and her private attorney do not constitute reporting under the WPA.[60]

In this case, plaintiff's communication with her private attorney was not "reporting" under the WPA. There is no dispute that plaintiff and attorney Richard Gay had an attorney-client relationship, and thus an agency relationship. Plaintiff admits that she did not want Gay to act upon the alleged illegality—Fields's presence at MMCG in violation of the PPO. Plaintiff testified in the form of deposition testimony that she

_____

necessary to enable the attorneys . . . to serve as such attorney . . . .").

[59] *Swidler & Berlin v United States*, 524 US 399, 405 (1998).

[60] Plaintiff argues that she waived her attorney-client privilege, and thus her phone call with Gay was not a privileged communication. Plaintiff points to the deposition testimony of defendant's director of nursing, Brenda Whitman, arguing that she shared her confidential communications with Whitman. Plaintiff also argues that defendant was made aware of the phone call with Gay because she waived her attorney-client privilege. Plaintiff's claim of waiver misses the mark. The facts demonstrate that defendant was made aware of plaintiff's phone call with Gay after Fields's HIPAA complaint and through the subsequent privacy investigation. Thus, plaintiff's communications with Gay were privileged until at least the time of the disclosure. That plaintiff subsequently waived the attorney-client privilege does not mean that the privilege was void *ab initio*.

expressly told Gay "not to serve [Fields] . . . because she was so ill . . . ."[61]  When asked whether she told Gay "[l]et's not serve [Fields] because she's really sick, and the rumor is she might not live," plaintiff answered in the affirmative.  Plaintiff further stated that she called Gay because her "intent was to return his phone call, one; and, two, to tell her [sic] that [Fields] had violated the personal protective order one more time."  Moreover, plaintiff's motion seeking to hold Fields in contempt for violating the PPO was silent regarding her encounter with Fields at MMCG.  The facts clearly demonstrate that plaintiff did not want Gay to take any action upon the illegality.  Plaintiff's phone call with Gay was a privileged communication made under the attorney-client relationship; therefore, Gay had no authority to disclose that communication without plaintiff's consent.  Thus, when communicating with her private attorney, plaintiff did not intend to denounce an illegality or make a charge of misconduct to a "public body."  For these reasons, I conclude that plaintiff's communication with her private attorney was not "reporting" under the WPA.

Plaintiff's reliance on *Brown v Mayor of Detroit*[62] is misplaced.  In *Brown*, two Detroit police officers reported illegalities committed by fellow officers and the mayor of Detroit.  The whistleblower officers reported these illegalities to their superiors within the department.  We held that the WPA does not require that an employee of a "public body" report illegalities to an outside agency or higher authority, and we also held that there is no requirement that an employee who reports an illegality receives WPA protections only if reporting is outside the employee's job duties.  My position is wholly consistent with *Brown*.  First, *Brown* did not give meaning to the term "report" under the WPA, but rejected nontextual requirements for the definition of "public body" under MCL 15.361(d).  A whistleblower employee may still intend to denounce an illegality or make a charge of misconduct by reporting to a superior, assuming the superior meets the "public body" definition.  The employee nevertheless must still *report* to demonstrate such protected activity.  Second, like in *Brown*, the meaning of "report" under the WPA does not vary depending on the employee's specific job duties.  Protection under the WPA is not dictated by the employee's position or job requirements.  Thus, *Brown* does not support plaintiff's claim.[63]

---

[61] See Part I of this statement.

[62] *Brown v Mayor of Detroit*, 478 Mich 589 (2007).

[63] Plaintiff also relies on *Whitman v City of Burton*, 493 Mich 303 (2013), which held that an employee's motivation is not relevant as to whether the employee has engaged in a protected activity and that proof of primary motivation is not a prerequisite to bringing a claim.  My position is consistent with *Whitman*.  A whistleblower employee's motivation for reporting is not the same as the employee's intent to denounce an illegality or make a charge of misconduct to a "public body."  Put simply, motivation and intent are not synonymous.  "While motive is the inducement to do some act, intent is the mental

In sum, plaintiff's communication with her private attorney was not "reporting" under the WPA because plaintiff did not intend to denounce an illegality or make a charge of misconduct to a "public body."

## IV. STATEMENT TO THE LEGISLATURE

Although I would resolve this case on the meaning of "report" as that term is used in the WPA, I strongly encourage the Legislature to reexamine this inartfully drafted statute, particularly the "public body" definition under MCL 15.361(d).[64]  The statutory definition of "public body" is extremely expansive and may well exceed the scope of entities the Legislature intended to include as an entity or organization suitable to field a report of suspected illegal activity.  For example, MCL 15.361(d)(*vi*) clearly provides that a report to "[t]he judiciary [or] any member or employee of the judiciary" is a report to a "public body" under the WPA.  This provision fails to take into account the unique role of the judiciary as impartial arbiters of the law and the fact that the judiciary cannot act in the absence of a case or controversy properly filed before the Court.  How are the purported purposes of the WPA advanced if, in the course of exercising the judicial function, a judge learns that a witness observed what was perceived to be a violation of law?  More striking is the notion that a report can be made to any employee of the judiciary.  Did the Legislature truly intend for the reporting requirement of the WPA to be satisfied when a person reports or is about to report a suspected violation of law to a court reporter employed in any one of the many trial courts throughout Michigan?  The clear and unambiguous language of the WPA suggests the answer is yes.

---

resolution or determination to do it.  When the intent to do an act that violates the law exists, motive becomes immaterial."  *Black's Law Dictionary* (10th ed).  The whistleblower employee's subjective reasoning for engaging in a protected activity is irrelevant for a WPA claim.  Thus, plaintiff erroneously relies upon *Whitman*.

[64] The Legislature currently has a bill pending before the Michigan Senate that would amend the WPA, effectively broadening the scope of whistleblower protection.  See 2017 SB 789.  Senate Bill 789 would allow for a whistleblower employee to report a violation or suspected violation of law to: an amended definition of "public body" under MCL 15.361(d); "the press"; or the "state employee ombudsman" as defined under proposed MCL 15.361(e).  The "state employee ombudsman" would be defined in reference to a new legislative appointed position under the proposed State Employee Ombudsman Act.  See 2017 SB 788.  I, of course, take no stance on pending legislation, but my position in this statement should highlight the concerns with an extremely expansive WPA.

Similarly, I question whether the Legislature considered the vast implications of including in the exceedingly broad definition of "public body" all agents, boards, commissions, councils, and employees of the legislative and executive branches of government. If this is not what the Legislature intended, it would be well served to consider amending the definition of "public body" under the WPA.

## V. CONCLUSION

For these reasons, I respectfully dissent from the majority's order denying leave in this case. I conclude that plaintiff's communication with her private attorney was not "reporting" to a public body under the WPA. This conclusion is required by the ordinary meaning of the verb "report" within the WPA context and the sui generis nature of the attorney-client relationship. Accordingly, I would reverse the judgment of the Court of Appeals and remand this case to the Court of Appeals for consideration of the merits of plaintiff's claim of termination against public policy.[65]

MARKMAN, C.J., joins the statement of ZAHRA, J.

WILDER, J., did not participate because he was on the Court of Appeals panel.

CLEMENT, J., did not participate.

---

[65] *Pace*, 499 Mich at 10 n 19 (" '[I]f the WPA does not apply, it provides no remedy and there is no preemption.' "), quoting *Anzaldua v Neogen Corp*, 292 Mich App 626, 631 (2011).



I, Larry S. Royster, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

June 15, 2018



Clerk

t0612