(4) Respondent made false statements (a) during court proceedings over which she presided, (b) to the commission while under oath during these proceedings, and (c) while testifying at her deposition under oath in her divorce proceeding (Counts XIII, XIV, and XVII);
(5) Respondent was persistently impatient, undignified, and discourteous to those appearing before her (Counts IX, X, and XV);
(6) Respondent required her staff members to perform personal tasks during work hours (Count XI);
*292 (7) Respondent allowed her staff to work on her 2014 judicial campaign during work hours (Count XII); and
(8) Respondent improperly interrupted two depositions that she attended during her divorce proceeding (Count VII).
"The purpose of the judicial disciplinary process is to protect the people from corruption and abuse on the part of those who wield judicial power."[3] When evaluating a recommendation for discipline made by the commission, "[t]his Court gives considerable deference to the [commission's] recommendations for sanctions, but our deference is not a matter of blind faith."[4] "Instead, it is a function of the [commission] adequately articulating the bases for its findings and demonstrating that there is a reasonable relationship between such findings and the recommended discipline."[5] "This Court's overriding duty in the area of judicial discipline proceedings is to treat equivalent cases in an equivalent manner and ... unequivalent cases in a proportionate manner."[6] "In determining appropriate sanctions, we seek to restore and maintain the dignity and impartiality of the judiciary and to protect the public."[7]
In this case, we adopt the commission's findings of fact because our review of the record reveals that they are amply supported. In addition, we agree with the commission's conclusions of law and analysis of the appropriate sanction. Regarding the commission's conclusions of law, we agree that respondent violated Canons 1, 2(A), 2(B), and 7(B)(1)(b) of the Code of Judicial Conduct ; committed misconduct under MCR 9.104(1) to (4)[8] ; engaged in "misconduct in office" and "conduct clearly prejudicial to the administration of justice" under Const. 1963, art. 6, § 30 (2) and MCR 9.205(B) ; and violated the standards or rules of professional conduct adopted by the Supreme Court, contrary to MCR 9.104(4). Regarding the commission's disciplinary analysis, we agree with the commission that six of the seven factors articulated in In re Brown[9] weigh in favor of a more serious sanction, and we conclude that the sanction we have imposed in this case is proportional to sanctions imposed in other judicial-misconduct cases.[10] We are particularly persuaded that these most severe sanctions are necessary because of respondent's misconduct in making false statements under oath, in tampering with evidence in her divorce proceedings, and in failing to disclose the extent of her relationship with Detective Furlong in People v. Kowalski .[11]
*293 We have considered respondent's argument that the participating members of the commission should have disqualified themselves. We find respondent's argument to be without merit.
On the basis of the intentional misrepresentations and misleading statements in respondent's written responses to the commission and during her testimony at the public hearing, we find respondent liable under MCR 9.205(B), in an amount subject to review by this Court, for the costs, fees, and expenses incurred by the commission in prosecuting the complaint. We order the commission to submit an itemized bill of costs.
The cumulative effect of respondent's misconduct convinces this Court that respondent should not remain in judicial office. Therefore, we remove respondent from office and conditionally suspend her without pay for a period of six years, with the suspension becoming effective only if respondent regains judicial office during that period.[12] Pursuant to MCR 7.315(C)(3), the Clerk of the Court is directed to issue the order removing and suspending respondent from office forthwith.
Bridget M. McCormack, C.J., David F. Viviano, C.J. Pro Tem, Stephen J. Markman, Brian K. Zahra, Richard H. Bernstein, Elizabeth T. Clement, Megan K. Cavanagh, JJ., concur.
EXHIBIT
*294 STATE OF MICHIGAN
BEFORE THE JUDICIAL TENURE COMMISSION
COMPLAINT AGAINST: HON. THERESA M. BRENNAN Formal Complaint No. 99 53rd District Court 224 N. First Street Brighton, MI 48116
DECISION AND RECOMMENDATION FOR DISCIPLINE
At a session of the Michigan Judicial Tenure Commission held on April 8, 2019, in the City of Detroit PRESENT:[1] Hon. Monte J. Burmeister, Chairperson Thomas J. Ryan, Esq., Vice-Chairperson Hon. Karen Fort Hood, Secretary Ari Adler Hon. Jon H. Hulsing Melissa B. Spickler Hon. Brian R. Sullivan
I. Introduction
The Judicial Tenure Commission of the State of Michigan ("Commission") files this recommendation for discipline against Hon. Theresa M. Brennan ("Respondent"), who at all material times was a judge of the 53rd District Court ("the Court") in the City of Brighton, County of Livingston, State of Michigan.
*295 This action is taken pursuant to the authority of the Commission under Article 6, § 30 of the Michigan Constitution of 1963, as amended, and MCR 9.203.
Having reviewed the hearing transcript, the exhibits, and the Master's report, and having considered the oral arguments of counsel, the Commission concludes, as did the Master, that the Examiner has established by a preponderance of the evidence that Respondent committed misconduct, including failing to disclose relevant facts regarding her relationship with a lead detective in a criminal case before her, failing to disclose relevant facts regarding her relationship with an attorney representing a litigant in a case before her, failing to immediately recuse herself from her own divorce case, tampering with evidence in her own divorce case, and lying under oath.
For the reasons set forth herein, the Commission recommends that the Supreme Court remove Respondent from the office of judge of the 53rd District Court on the basis of her judicial misconduct. In addition, the Commission recommends that the Supreme Court order Respondent to pay costs, fees, and expenses in the amount of $35,570.36 pursuant to MCR 9.205(B), based on her intentional misrepresentations and misleading statements made to the Commission.
II. Procedural Background
On June 12, 2018, the Commission filed a Formal Complaint against Respondent. On July 23, 2018, the Commission filed its First Amended Complaint *296 against Respondent, alleging (1) failure to disclose the extent of her relationship with Detective Sean Furlong, or to disqualify herself, inPeople v Kowalski, (2) failure to disclose the extent of her relationship with Shari Pollesch and Pollesch's law firm in several cases before her, (3) failure to disclose her relationship with Francine Zysk a/k/a Francine Sumner, or to disqualify herself, in Zysk/Sumner's divorce case, (4) failure to disqualify herself from her own divorce case,Root v Brennan, (5) appearance of impropriety regarding Sean Furlong, (6) appearance of impropriety regarding Francine Zysk, (7) conduct during depositions inRoot v Brennan, (8) failure to be faithful to the law inBrisson v Terlecky, (9) improper demeanor inBrisson v Terlecky, (10) improper demeanor inSullivan v Sullivan, (11) directing staff to conduct Respondent's personal tasks on court time, (12) improper campaign activities, (13) misrepresentations during court proceedings, and (14) misrepresentations to the Commission.
The Michigan Supreme Court appointed Hon. William J. Giovan as Master, to conduct a public hearing on the allegations in the Formal Complaint. The Master held an eight-day public hearing on the First Amended Complaint, commencing October 1, 2018. The Commission filed its Second Amended Complaint on October 29, 2018, deleting Count III regarding failure to disclose or disqualify with respect to Francine Zysk and Count VI regarding an appearance of impropriety with respect to Francine Zysk, and adding claims for persistent *297 discourtesy (Count XV), destruction of evidence (Count XVI), and perjury, false statements, and misrepresentations (Count XVII). Due to the additional charges, the Master held an additional day of testimony on November 19, 2018.
In the Master's Findings of Fact and Conclusions of Law, issued on December 20, 2018, the Master concluded by a preponderance of the evidence that Respondent committed misconduct in office with respect to all but one count in the Second Amended Complaint.[2] The Commission heard objections to the Master's report at a hearing held on March 4, 2019.
III. Standard of Proof
The standard of proof applicable in judicial disciplinary matters is the preponderance of the evidence standard.In re Ferrara, 458 Mich. 350, 360; 582 N.W.2d 817 (1998). The Examiner bears the burden of proving the allegations in the Complaint. MCR 9.211(A). The Commission reviews the master's findings de novo.In re Chrzanowski, 465 Mich. 468, 480-481; 636 N.W.2d 758 (2001). Although the Commission is not required to accept to the master's findings of fact, *298 it may appropriately recognize and defer to the master's superior ability to observe the witnesses' demeanor and comment on their credibility. Cf.In re Lloyd, 424 Mich. 514, 535; 384 N.W.2d 9 (1986).
IV. Findings of Fact
The Commission adopts the Master's findings of fact, except where specifically noted below. The Commission highlights and supplements the facts found by the Master, as follows:
Count I
Failure to Disclose/Disqualify in People v Kowalski
In March 2009,People v Kowalski, Case No. 08-17643-FC, in which the defendant was charged with first-degree murder, was assigned to Respondent. Michigan State Police Detective Sean Furlong was the co-officer in charge of the case. Detective Furlong investigated the case, took the defendant's confession, and testified at trial. Before theKowalski case was assigned to Respondent, Respondent told her judicial secretary/court recorder Kristi Cox, that she was sure that Mr. Kowalski was guilty based on a conversation she had about the case with Detective Furlong. Nevertheless, Respondent presided over pretrial hearings in the case, ruling that the defendant's confession was admissible and that a defense expert witness was precluded from testifying at trial regarding false confessions. These rulings were affirmed on appeal.
*299 The case was scheduled for trial on January 7, 2013. On January 4, 2013, the assistant prosecutor assigned to the case received a letter from attorney Thomas Kizer, alleging inappropriate contacts between Respondent and Detective Furlong, and between Respondent and Detective Furlong's colleague, Detective Christopher Corriveau. At a pretrial conference in Respondent's chambers on January 4, 2013, the assistant prosecutor and defense counsel advised Respondent of the allegations of inappropriate contact. In response to the allegations, Respondent stated that, while she was friends with the two detectives, there was nothing that required her disqualification. Thereafter, Mr. Kowalski moved to disqualify Respondent from the case. Respondent denied the motion, explaining that, while she was friends with Furlong and Corriveau, the friendships did not affect her ability to fairly decide the case. Chief Judge David Reader later affirmed the denial of the motion to disqualify. At no time did Respondent inform the parties that she had told a member of the her staff that Detective Furlong had persuaded her of Mr. Kowalski's guilt before the case was assigned to her, that she had more than 1500 telephone calls of a social nature with Furlong between July 2008 and the beginning of theKowalski trial, that she was on the phone with Furlong for 1-2 hours every month between November 2011 and the start of theKowalski trial, or that she exchanged approximately 400 texts with Furlong from 2010 until the start of theKowalski trial.
*300 The Master concluded that Respondent was engaged in a romantic relationship with Furlong before and during theKowalski case. The Master's finding was based, at least in part, on evidence that Furlong kissed Respondent in her chambers in 2007,[3] and evidence that, after theKowalski sentencing, Kristi Cox found Respondent in her office, severely distressed because Furlong had told her that they could no longer be friends. Respondent's distress was so severe that she was unable to take the bench for her afternoon docket. In addition to these incidents, the Master's conclusion was based on evidence that Respondent socialized with Furlong, that she allowed him to use her cottage, that Furlong had been a dinner guest at her home, and that Respondent's husband sometimes gave Furlong his University of Michigan football season tickets at Respondent's urging, as well as evidence of the number of telephone calls and texts between Respondent and Furlong.
The Commission finds it unnecessary to determine whether the relationship between Respondent and Furlong was a romantic one. Regardless of whether the relationship was "romantic," as found by the Master, or a close friendship, the evidentiary record shows that Respondent was engaged in what was clearly a very close, personal relationship with Furlong during the relevant time period. The relationship required, at a minimum, that Respondent disclose the fact of her close, *301 personal relationship to the parties in theKowalski case so that the parties could determine whether to move for disqualification under MCR 2.003.[4]
Count II
Failure to Disclose/Disqualify in Cases Involving Shari Pollesch
Respondent was a friend of attorney Shari Pollesch, a principal in a law firm located in Brighton, Michigan. Respondent considered Ms. Pollesch one of her best friends. Ms. Pollesch testified that she and Respondent were "close friends," that she had known Respondent for about 25 years, and that "[e]verybody knew" that she and Respondent were longtime friends. During their friendship, Respondent and Ms. Pollesch took ski trips together, participated in a book club, took walks during lunch, and were guests at each other's cottages. In addition, Respondent provided her home for Ms. Pollesch's wedding. Ms. Pollesch provided legal services to Respondent's husband's business, to Respondent's husband, personally, and to Respondent's sister. Ms. Pollesch was one of three friends that submitted a statement to the Judicial Tenure Commission on Respondent's behalf in 2009.
*302 Ms. Pollesch appeared as counsel in five cases before Respondent in 2014-2016. Attorneys from Ms. Pollesch's firm appeared before respondent in another five cases. Respondent failed to disclose her close, personal relationship with Ms. Pollesch to the parties in the cases in which Ms. Pollesch or another member of her firm appeared as counsel before Respondent. In addition, Respondent denied motions for disqualification in two cases in which disqualification was sought on the basis of a relationship with Ms. Pollesch, inScheibner v Scheibner, Case No. 13-47392-DM andMcFarlane v McFarlane, Case No. 15-6492-DO.
Counts IV and XVI
Failure to Immediately Disqualify in Her Own Divorce Case and Destruction of Evidence
Respondent's former husband, Donald Root, filed a complaint for divorce from Respondent on or about December 2, 2016. The case was assigned to Respondent under a court policy providing that all "DO" cases were to be assigned to her. Chief Judge David Reader advised Respondent of the filing that day. Respondent did not disqualify herself from the case that day or the following business day, Monday, December 5, 2012. On Tuesday, December 6, 2016, Donald Root filed a Motion for Entry of Ex Parte Mutual Restraining Order Regarding the Duty to Preserve Evidence. Chief Judge Reader instructed his secretary, Jeannine Pratt, to call Respondent to emphasize the immediate need for a *303 disqualification order. Ms. Pratt called Respondent and emailed to her a copy of the ex parte motion and a disqualification order. Ms. Pratt advised Respondent that she would pick up the executed order that afternoon. When Ms. Pratt arrived to pick up the executed order, Respondent told her that she would not be signing the order until she spoke to her attorney. The next day, December 7, 2016, Respondent's office informed Judge Reader that the signed disqualification order was in the court mail. The disqualification order was received by the Howell court on December 8, 2016.
Between her learning of the filing of the ex parte motion on December 6, 2016, and the receipt of the disqualification order by the Howell court on December 8, 2016, Respondent attempted to delete information and an email account from her cell phone. On December 8, 2018, Respondent asked her court recorder, Felica Milhouse, to attempt to delete her Hotmail account from the cell phone. Milhouse attempted to delete the account through the phone's settings, but was unsuccessful. Milhouse then conducted a Google search regarding how to delete a Hotmail account from a cell phone. When Milhouse was unable to immediately delete the account, Respondent, who was about to take the bench, directed Milhouse to leave the courtroom and to return to the office after calling the first case to continue to attempt to delete the account. Despite her attempts, Milhouse ultimately was unsuccessful in deleting the account.
*304 On or about December 8, 2016, Respondent bought a new cell phone at an AT&T store. At Respondent's request, the AT&T store employee transferred the data from her original phone to her new phone, and had her original phone reset to its factory settings, erasing all data from the original phone. Respondent testified that there were "some glitches" when the contents of the original phone were transferred to the new phone. Respondent then gave the original phone, which now contained no data, to her attorney, without communicating to anyone that she had wiped the data from the original phone. When asked whether she advised anyone that the data from the original phone had been transferred to her new phone, Respondent testified that the issue never came up because the divorce ultimately settled four months later.
On November 2, 2018, the parties stipulated to the following facts:
When data is copied from the old phone to the new phone, there is not a bit-for-bit copying of the data, and it is likely that some data is not copied. The data that may not be copied includes registry data, metadata, file system data, and database information, all of which are useful to a forensic search of the old phone. Accordingly, it is likely that restoring the old phone to factory settings will result in the loss of forensically useful information, even if the owner of the old phone makes an effort to copy all data from the old phone to the new phone.
Once the old phone is reset to factory settings it is no longer possible to determine what data was not copied to the new phone. For instance, if a customer tells the tech to copy everything to the new phone except X, and the tech does that and then resets the old phone to factory settings, it is no longer possible to determine what X was, or that X was not copied. Similarly, if a customer deletes some data from the old phone before giving it to the tech, then asks the tech to copy everything that is on the old phone to the new phone, then the old phone is restored to factory settings, it is no longer possible to determine what the customer deleted from the old phone prior to requesting that data be copied to the new phone.
*305 Given these facts, it is more likely than not that Respondent's conduct constituted tampering with evidence, in violation of MCL 750.483a(5)(a).
Counts XIII, XIV, and XVII
Misrepresentations, False Statements, and Perjury
The Master described Respondent's willingness to give false testimony under oath as "breathtaking." The Commission agrees that the evidence shows that Respondent made misrepresentations and false statements with a frequency and intent to deceive that is completely at odds with her position as an officer of the court. While, except where noted, the Commission adopts the Examiner's "Appendix 2 - False Statements," as accurate, as did the Master, it emphasizes the following false and material misrepresentations made by Respondent:
A.False Statements Under Oath at Deposition
Respondent made false statements under oath while testifying at her deposition in her divorce case. On January 16, 2017, Respondent testified during her deposition that when she asked her staff to attempt to delete her email account from her cell phone, she was speaking only "jokingly." Respondent's testimony *306 was false. Respondent's court recorder, Felica Milhouse, denied that Respondent was joking when she asked Milhouse to attempt to delete the email account. Because she did not believe Respondent's request was a joke, Milhouse attempted to delete the account through the phone's settings and then conducted a Google search regarding how to delete the account. When Milhouse's initial attempts at deleting the account were unsuccessful, Respondent directed Milhouse to leave the courtroom after calling the first case and to return to the office to continue her attempts to delete the account. In addition, research attorney Robbin Pott testified that she overheard Respondent asking her judicial secretary and her court reporter how to delete information from a cell phone. Pott also overheard Respondent asking a police officer, who came in to have a warrant signed, what was the best way to destroy a phone. Pott testified that Respondent's continued requests for advice regarding how to delete information from the cell phone convinced Pott that Respondent was not joking. Further, Respondent eventually admitted in her testimony at the formal hearing that she was sincere in her request that Milhouse attempt to delete the email account from the cell phone.
On February 9, 2017, Respondent falsely testified at her deposition that she did not request help with deleting information from her cell phone. The evidence showed that Respondent asked employee Felica Millhouse to help her to delete her email account from the cell phone on December 8, 2016. Respondent testified at *307 her deposition that she did not take any steps to delete information from, or to reset, her cell phone. Contrary to this representation, the evidence showed that Respondent asked an employee of an AT&T store to delete messages from her cell phone on December 8, 2016. Moreover, Respondent acknowledged at the formal hearing that she caused an employee of an AT&T store to transfer all data from the original cell phone to a new cell phone and to then reset the original cell phone to its factory settings, deleting all date from the original phone.
B.False Statements During Court Proceedings
Respondent minimized her relationship with Detective Furlong during theKowalski case. Respondent's statements during the hearing on theKowalski defendant's motion for disqualification concealed the depth of her relationship with Furlong. Respondent represented on the record that her relationship with Furlong was simply that she was "friends" with him, just as she was friends with the prosecutor or the prosecutor's wife. The extensive evidence presented at the formal hearing regarding the especially close and personal nature of Respondent's relationship with Furlong demonstrates that Respondent's characterization of the relationship was false.
Respondent made another false misrepresentation on the record inMcFarlane v McFarlane, over which Respondent presided. TheMcFarlane defendant moved to disqualify Respondent on the basis of her relationship with *308 Shari Pollesch. During April 25, 2017 hearing on the motion, Respondent falsely stated on the record that she had learned that Shari Pollesch provided legal representation to her husband only shortly before her divorce complaint was filed in December 2016. This representation was shown to be false by Respondent's own statement on the record inParker & Parker v Magyari, 53rd District Court Case No. 14-4250-GC, on December 16, 2014, that her "best friend," i.e, Shari Pollesch, provided legal representation to her husband. (Exhibit 2-43). In addition, Respondent's now former husband, Daniel Root, testified that Shari Pollesch began providing legal representation to his business in June 2011 and that he and Pollesch terminated the legal representation when he filed for divorce from Respondent, in December 2016. Root testified that he was "very confident" that Respondent knew that Shari Pollesch represented him.
C.Material Misrepresentations to the Commission
Respondent made material, false statements, under oath, to the Commission during these proceedings. Respondent made a false and material misrepresentation to the Commission regarding when she learned that Shari Pollesch provided legal representation to her former husband, Daniel Root. Respondent represented to the Commission, under oath, that she learned of Pollesch's representation of Root only shortly before the complaint in her divorce case was filed, in December 2016. This representation was shown to be false by Respondent's own statement on the record *309 inParker & Parker v Magyari, 53rd District Court Case No. 14-4250-GC, on December 16, 2014, that her "best friend," i.e, Shari Pollesch, provided legal representation to her husband. (Exhibit 2-43). In addition, Daniel Root testified that he was "very confident" that Respondent knew that Shari Pollesch represented him.
Respondent represented to the Commission, under oath, in both a written response and during testimony at the formal hearing, that she rarely handled warrant requests while on the bench, and that she routinely took officers to her office to sign warrants. Respondent's statements were contradicted by testimony from Kristi Cox that, if a police officer came in for a search warrant when Respondent was on the bench, Respondent would stop the proceedings and handle the search warrant in the courtroom. Felica Milhouse also testified that Respondent normally handled warrants from the bench if an officer came into the courtroom while court was in session. Cox testified that if Detective Furlong came to the courtroom for a search warrant, however, Respondent would declare a recess, take Detective Furlong back to her office, and close the door.
Respondent represented to the Commission that she did not text Detective Furlong during theKowalski trial. This representation was shown to be false by telephone records showing that Respondent did, in fact, text Detective Furlong during the trial. See Exhibit I-24.
*310 Respondent made a false and material misrepresentation to the Commission that she never allowed campaign work to be done during work hours. The testimony of Kristi Cox and Jessica Sharpe, discussed above, that Respondent worked with them on campaign activities during work hours demonstrated that Respondent knew that her statements to the Commission were false.
Counts IX and X
Improper Demeanor
While the Commission does not adopt the Master's finding that it was "the universal opinion of any witness who testified about the judge's demeanor" that she was consistently abusive to the attorneys, litigants, and witnesses, the Commission does find that a preponderance of the evidence showed that Respondent was persistently impatient, undignified, and discourteous to those appearing before her. Attorneys testifying at the formal hearing indicated that Respondent was routinely disrespectful to attorneys and litigants, and described Respondent's demeanor on the bench as "appalling" and "abusive." One of the attorneys testified that Respondent "would routinely interrupt and basically prevent you from presenting your case to her," and that "[s]he never had the information she needed to make her best decision. I don't think she cared." InSullivan v Sullivan, unpublished per curiam opinion of the Court of Appeals, issued May 17, 218 (Docket Nos. 330543, 334273), a divorce case over which Respondent *311 presided, the Court of Appeals determined that Respondent's hostility toward counsel was such that "[t]he appearance of justice would be better served if the case is remanded to a different judge."
Count XI
Directing Employees to Perform Respondent's Personal Tasks
The Commission adopts the Master's finding that Respondent committed misconduct by requiring her staff members to perform personal tasks during work hours, noting that "[w]hatever may be the correct standard of what a judge can properly ask of an employee, Judge Brennan went far beyond it." The evidence showed that Respondent required her staff to perform personal tasks during work hours, such as taking her car to the dealership, refueling her car, paying her bills, waiting at Respondent's house for cable television to be installed, and staining the deck of Respondent's home.[5]
Count XII
Improper Campaign Activities
The Master concluded that Respondent engaged in misconduct by allowing her staff to work on her 2014 judicial campaign during work hours. Both Kristi Cox and Jessica Sharpe testified that, on one occasion, they assisted Respondent *312 with her campaign by responding to questionnaires from news outlets during work hours. Specifically, Kristi Cox testified that, while some of the work was done in the break room:[6]
... it was kind of a joke that we used that we were on break, quote/unquote, and we'd kind of laugh about it and we'd go in there. But it wasn't a 15-minute break. It would be an hour and a half or so while we struggled with the phrasing we were going to use.
A thumb drive containing documents Cox worked on for the 2014 campaign, showing that the documents were modified during work hours, was admitted into evidence at the formal hearing (Exhibit 11-1). Sharpe's and Cox's testimony that Respondent was in the room, performing the campaign work along with them, showed that Respondent was aware that her staff members were performing the campaign task during work hours. On another occasion, Sharpe and Cox, along with Respondent, conducted online research in the courtroom regarding "what kind of swag" would be used at a campaign party. On the basis of Sharpe's and Cox's *313 testimony, the Commission concludes that Respondent committed misconduct by allowing her staff to perform campaign tasks during work hours.
The Commission is not persuaded by Respondent's argument that she did not violate Michigan's Campaign Finance Act because she was not "a public body or a person acting for a public body." Section 57 of the Campaign Finance Act, MCL 169.257(1), provides, in part, as follows:
A public body or a person acting for a public body shall not use or authorize the use of funds, personnel, office space, computer hardware or software, property, stationery, postage, vehicles, equipment, supplies, or other public resources to make a contribution or expenditure or provide volunteer personal services that are excluded from the definition of contribution under section 4(3)(a).
MCL 169.211(7) defines a "public body" to include "[a]ny other body that is created by state or local authority or is primarily funded by or through state or local authority, if the body exercises governmental or proprietary authority or performs a governmental or proprietary function." The 53rd District Court was created by state authority, MCL 600.8101. In addition, the district court performs a governmental function authorized by Const 1963, Article VI, § 1. Accordingly, the district court is a "public body" within the meaning of the Act.
*314 Count VII
Conduct During Depositions
Respondent improperly interrupted two depositions that she attended during her divorce case. On January 18, 2017, when Detective Furlong, the deponent, testified that that he and respondent had not exchanged any texts or telephone messages during theKowalski trial, Respondent interjected, "We did once." On March 9, 2017, when deponent Francine Zysk began to answer a question regarding an allegation that Respondent was intoxicated in her office, Respondent interrupted, stating "Okay, you need to stop for a minute." She then added, "You are lying. You're such a liar."
Respondent's Gender Bias Argument
Respondent argues that the Master's findings should be disregarded because they reflect a gender bias. As one example, Respondent cites the Master's use of the term "hottest" to describe a part of the relationship between Respondent and Detective Furlong. While the Commission believes that the Master's choice of words was unfortunate, the issue whether the relationship was of a romantic nature or simply a close friendship does not change the relevant analysis, as noted above. Under either scenario, Respondent did not take actions she was required to take to fulfill her judicial duties. Having considered Respondent's argument, the *315 Commission concludes that the allegations of gender bias do not change the evidentiary record, which supports the bulk of the Master's findings.
V. Conclusions of Law
Respondent's conduct breached the standards of judicial conduct, and she is responsible for the following:
a. Misconduct in office, as defined by the Michigan Constitution of 1963, as amended, Article 6, Section 30, and MCR 9.505;
b. Conduct clearly prejudicial to the administration of justice, as defined by the Michigan Constitution of 1963, as amended, Article 6, Section 30, and MCR 9.205(B);
c. Failure to establish, maintain, enforce, and personally observe high standards of conduct so that the integrity and independence of the judiciary may be preserved, contrary to MCJC, Canon 1;
d. Irresponsible or improper conduct that erodes public confidence in the judiciary, in violation of MCJC, Canon 2A;
e. Conduct involving impropriety and appearance of impropriety, contrary to MCJC, Canon 2A;
f. Failure to respect and observe the law and to conduct oneself at all times in a manner which would enhance the public's confidence in the integrity and impartiality of the judiciary contrary to the Code of Judicial Conduct, Canon 2B;
g. Failure to prohibit public employees subject to the judge's direction from doing for the judge what the judge is prohibited from doing under this canon, contrary to Canon 7B(1)(b);
*316 h. Conduct that is prejudicial to the proper administration of justice, in violation of MCR 9.104(1);
i. Conduct that exposes the legal profession or the courts to obloquy, contempt, censure, or reproach, contrary to MCR 9.104(2);
j. Conduct that is contrary to justice, ethics, honesty or good morals, contrary to MCR 9.104(3); and
k. Conduct that violates the standards or rules of professional conduct, specifically MRPC 3.3(a)(1), adopted by the Supreme Court, contrary to MCR 9.104(4);
VI. Disciplinary Analysis
The Commission concludes that Respondent committed judicial misconduct by failing to disclose the relevant facts regarding her relationship with Detective Furlong and Shari Pollesch and/or failing to disqualify herself, failing to immediately disqualify herself from her own divorce case, tampering with evidence in her divorce case, making false and material misrepresentations to the Commission, testifying falsely under oath in her divorce case, making false statements on the record in cases over which she presided, directing staff to perform campaign activities during work hours, directing staff to perform personal tasks for her during work hours, persistently maintaining an improper demeanor on the bench, and improperly interfering in depositions during her divorce case. Based on its finding of misconduct, the Commission recommends that Respondent *317 be removed from judicial office. This recommendation is based on the following evaluation of the factors set forth inIn re Brown, 461 Mich. 1291, 1292-1293; 625 N.W.2d 744 (1999).
A.The Brown Factors
(1) Misconduct that is part of a pattern or practice is more serious than an isolated instance of misconduct.
The evidence showed that Respondent engaged in a pattern of deceit. Respondent made material misrepresentations during her deposition in her divorce case and in sworn statements to the Commission. In addition, Respondent engaged in deceitful conduct by failing to disclose material facts regarding her relationships with Detective Furlong and Shari Pollesch to parties appearing before her. Respondent attempted to conceal evidence in her divorce proceeding by deleting all data from the cell phone that she turned over to her attorney. Respondent's dishonesty was not an isolated incident, but pervaded her conduct both on and off the bench.
InIn re Gorcyca, 500 Mich. 588, 637; 902 N.W.2d 828 (2017), the Court noted "[t]he fact that a statement may be incorrect does not, by itself, render the statement `false' within the context of a legal proceeding." TheGorcyca decision involved a judge's representation regarding the meaning of a gesture she made with her finger. The representation at issue inGorcyca was isolated and finite in *318 nature. By contrast, the record in the instant case reveals a series of misrepresentations that appear to have been made intentionally as part of a pattern of deceit.
In addition to a pattern of deceit, the evidence showed a pattern of Respondent abusing staff, attorneys, and litigants. The firstBrown factor weighs heavily in favor of a more serious sanction.
(2) Misconduct on the bench is usually more serious than the same misconduct off the bench.
The evidence showed that Respondent engaged in misconduct on the bench. Respondent's failure to disclose the facts of her relationships with Detective Sean Furlong and attorney Shari Pollesch to the parties appearing before her was misconduct on the bench. In addition, Respondent repeatedly mistreated attorneys and litigants appearing before her. The Commission concurs with the Examiner's contention that, while Respondent's failure to promptly disqualify her self from her own divorce proceeding was not misconduct that occurred on the bench, "it is so closely related to her judicial duties as to be inseparable from on-bench conduct." The secondBrown factor weighs heavily in favor of a more serious sanction.
*319 (3) Misconduct that is prejudicial to the actual administration of justice is more serious than misconduct that is prejudicial only to the appearance of propriety.
"[T]here is not much, if anything, that is more prejudicial to the actual administration of justice than testifying falsely under oath."In re Adams, 494 Mich. 162, 182; 833 N.W.2d 897 (2013). Again, the evidence showed that Respondent lied under oath during her divorce proceeding and in sworn statements to the Commission. In addition, Respondent's failure to disclose her relationship with Detective Furlong, including the fact that she told a staff member that Furlong had convinced her of theKowalski defendant's guilt, prevented the parties from addressing any bias earlier in the case. Similarly, Respondent's failure to disclose her personal relationship with Shari Pollesch to parties appearing before her denied the parties the opportunity to challenge her ability to be impartial. The thirdBrown factor weighs in favor of a more serious sanction.
(4) Misconduct that does not implicate the actual administration of justice, or its appearance of impropriety, is less serious than misconduct that does.
As discussed above, Respondent's misconduct implicated the actual administration of justice and, therefore, weighs in favor of a more serious sanction.
*320 (5) Misconduct that occurs spontaneously is less serious than misconduct that is premeditated or deliberated.
In many cases, Respondent's misconduct was premeditated and deliberate rather than spontaneous. Respondent's attempts to tamper with evidence in her divorce case did not occur spontaneously but took place over a period of days. While, after learning of the motion to preserve evidence, Respondent initially asked her staff to attempt to delete an email account from her cell phone, her staff was ultimately unsuccessful in doing so. Respondent eventually succeeded in having all data deleted from the cell phone, and transferred to a new phone, before giving the original phone, which contained no data, to her attorney. As the parties stipulated on November 2, 2018, it is likely that some data was lost during the transfer. From the time she was made aware of her husband's motion to preserve evidence to the time she asked the AT&T store employee to delete all date from the original telephone, Respondent had time to reflect on her actions.
Further, Respondent's attempts to mislead the Commission do not appear to have been made spontaneously. Almost certainly, Respondent would have given herself time to reflect on her written responses before submitting them to the Commission. Therefore, it cannot be said that these misrepresentations were made spontaneously. While it is not known whether Respondent's false testimony during her divorce deposition and her false statements on the record in cases over *321 which she presided were spontaneous or deliberate, it is likely that Respondent had time to consider her statements and knew that they were false when made.
Respondent's failure to disclose her personal relationships with Sean Furlong and Shari Pollesch also appears to have been deliberate. Respondent had the time and opportunity to consider disclosing the relevant information but repeatedly failed to do so. The fifthBrown factor weighs heavily in favor of a more serious sanction.
(6) Misconduct that undermines the ability of the justice system to discover the truth of what occurred in a legal controversy, or to reach the most just result in such a case, is more serious than misconduct that merely delays such discovery.
Respondent failed to disqualify herself from presiding over a murder trial despite having a close, personal relationship with Detective Furlong, and despite having told a staff member before she was assigned to the case that she believed the defendant to be guilty based on a conversation she had with Detective Furlong. Respondent's failure to disclose her close, personal relationships with Detective Furlong and Shari Pollesch undermined the parties' ability to discover or challenge any bias or partiality.
Respondent caused information to be deleted from her cell phone after learning that her husband had filed a motion for preservation of evidence in her divorce case. While Respondent's divorce case ultimately settled, Respondent's *322 destruction of potential evidence in the divorce case with knowledge that a motion for preservation of evidence was pending is a stunning example of misconduct that undermined the ability of the justice system to discover the truth of what occurred in a controversy.
Respondent's false and misleading statements made under oath in her divorce proceeding and in these disciplinary proceedings undermined the ability of the justice system to discover the truth of what occurred. The sixthBrown factor weighs heavily in favor of a more serious sanction.
(7) Misconduct that involves the unequal application of justice on the basis of such considerations as race, color, ethnic background, gender, or religion are more serious than breaches of justice that do not disparage the integrity of the system on the basis of a class of citizenship.
The evidence does not show that Respondent's actions caused the unequal application of justice on the basis of a class of citizenship. Accordingly, this factor does not weigh in favor of a more severe sanction.
In sum, our consideration of the totality of all sevenBrown factors weighs in support of the imposition of a more severe sanction.
In addition to theBrown factors, the Michigan Supreme Court has consistently concluded that "dishonest or selfish conduct warrants greater discipline than conduct lacking such characteristics."In re Morrow, 496 Mich. 291, 302-303; 854 N.W.2d 89 (2014). Further, inIn re Adams, 494 Mich. 162, 833 N.W.2d 897 *323 (2013), the Court reasoned that a sanction may be less severe where a respondent acknowledges his or her misconduct and is truthful throughout the disciplinary proceedings, but "where a respondent is not repentant, but engages in deceitful behavior during the course of a Judicial Tenure Commission disciplinary investigation, the sanction must be measurably greater." (CitingIn re Noecker, 472 Mich. 1, 18; 691 N.W.2d 440 (2005) (Young, J., concurring)). This principle further supports our conclusion that Respondent's dishonest conduct warrants a more severe sanction where the record shows that Respondent has failed to take responsibility for her misconduct and has attempted to minimize, and to provide false explanations for, her conduct throughout these proceedings.
B.The Basis for the Level of Discipline and Proportionality
The primary concern in determining an appropriate sanction is to "restore and maintain the dignity and impartiality of the judiciary and protect the public."In re Ferrara, 458 Mich. 350, 372, 582 N.W.2d 817 (1998). In determining an appropriate sanction in this matter, the Commission is mindful of the Michigan Supreme Court's call for "proportionality" based on comparable conduct. Based on the facts, the Commission believes that removal from office is an appropriate and proportional sanction for Respondent's misconduct.
The Court has consistently concluded that lying under oath warrants removal from office. SeeIn re Ryman, 394 Mich. 637, 642-643; 232 N.W.2d 178 (1975);In *324 re Loyd, 424 Mich. 514, 516, 535-536; 384 N.W.2d 9 (1986);In re Ferrara, 458 Mich. 350, 372-373; 582 N.W.2d 817 (1998);In re Noecker, 472 Mich. 1, 3, 12-13; 691 N.W.2d 440 (2005);In re Nettles-Nickerson, 481 Mich. 321, 322; 750 N.W.2d 560 (2008);In re Justin, 490 Mich. 394, 396-397; 809 N.W.2d 126 (2012);In re James, 492 Mich. 553, 568-570; 821 N.W.2d 144 (2012). InIn re Adams, 494 Mich. 162, 173; 833 N.W.2d 897 (2013), the respondent signed her attorney's name to a pleading without permission and then filed the pleading in the respondent's divorce case. In addition, the respondent lied under oath in her divorce proceedings and made misrepresentations to the Commission during its investigation.Id. at 171, 175. While the Commission recommended that the respondent be suspended without pay for 180 days and be ordered to pay costs, the Court "[did] not believe that such a sanction would sufficiently address the harm done to the integrity of the judiciary."Id. at 184. Rather, the Court concluded that "because testifying falsely under oath is `antithetical to the role of a Judge who is sworn to uphold the law and seek the truth,' (citation omitted), and also because respondent has not demonstrated any apparent remorse for her misconduct and continues to deny responsibility for her actions, we believe that the only proportionate sanction is to remove respondent from office."Id. at 186-187.
The Court's statements inAdams leave little doubt that removal from office is the appropriate sanction in this case. In addition to other misconduct, *325 Respondent made intentional and false representations, under oath, during her divorce deposition and during the Commission's investigation and proceedings. Dishonesty in these circumstances erodes the public's confidence in the judiciary,In re Noecker, 472 Mich. 1, 13; 691 N.W.2d 440 (2005), and renders a judge a judge "unfit to sit in judgment of others,"In re Justin, 490 Mich. 394, 424; 809 N.W.2d 126 (2012). Further, Respondent has continued to deny and to minimize her misconduct throughout these proceedings.[7] The Commission therefore concludes that Respondent's misconduct warrants removal from office.
VII. Assessment of Costs, Fees, and Expenses
As noted, the Commission finds that Respondent made intentional misrepresentations and misleading statements to the Commission in her written responses to the Commission and during her testimony at the public hearing. Accordingly, the Commission requests that Respondent be ordered to pay the costs, fees, and expenses incurred by the Commission in prosecuting the complaint. See MCR 9.205(B). The Examiner has submitted an affidavit showing costs, fees, and expenses incurred by the Commission in the amount of $35,570.36. Therefore, the Commission requests an assessment of costs, fees, and expenses in the total amount of $35,570.36.
*326 VIII. Conclusion and Recommendation
The Commission concludes that Respondent committed misconduct in office by, among other actions, failing to disclose the facts of her relationships with Detective Furlong and Shari Pollesch when warranted, by failing to immediately disqualify herself from her own divorce case, by tampering with evidence in her divorce case, and by making intentionally false and misleading statements on the record in cases over which she presided and during her divorce deposition. In addition, Respondent committed judicial misconduct by making intentional misrepresentations or misleading statements to the Commission in her written responses to the Commission and in her testimony at the public hearing. On the basis of her judicial misconduct, the Commission recommends that Respondent be removed from office and that the removal extend through the next judicial term. In addition, on the basis of the Commission's findings that Respondent made intentional misrepresentations or misleading statements to the Commission and to the Master, the Commission recommends that Respondent be ordered to pay an assessment of costs, fees, and expenses in the total amount $35,570.36.
*327 JUDICIAL TENURE COMMISSION
________ HON. MONTE J. BURMEISTER Chairperson ________ ________ THOMAS J. RYAN, ESQ. HON. KAREN FORT HOOD Vice-Chairperson Secretary ________ ________ ARI ADLER HON. JON H. HULSING ________ ________ HON. BRIAN R. SULLVAN MELISSA B. SPICKLER

In re McCree , 495 Mich. 51, 74, 845 N.W.2d 458 (2014) (quotation marks and citation omitted).

In re Simpson , 500 Mich. 533, 558, 902 N.W.2d 383 (2017) (quotation marks, citation, and brackets omitted).

Id. (quotation marks and citations omitted).

In re Morrow , 496 Mich. 291, 302, 854 N.W.2d 89 (2014) (quotation marks and citation omitted).

McCree , 495 Mich. at 74, 845 N.W.2d 458 (quotation marks and citation omitted).

Respondent has not argued that MCR 9.104, which governs professional disciplinary proceedings before the Attorney Disciplinary Board, is not applicable in this context. Therefore, we need not decide this question. See Simpson , 500 Mich. at 555 n. 26, 902 N.W.2d 383.

In re Brown , 461 Mich. 1291, 1292-1293, 625 N.W.2d 744 (1999).

We note that we are imposing a six-year conditional suspension effective on the date of this opinion, instead of having the removal extend through the next judicial term as requested by the commission.

We are not often confronted with the multifarious acts of misconduct that are present in this case. The individual findings of misconduct range from those warranting the most severe sanction of removal (such as lying under oath) to those that are still unacceptable, but might warrant a lesser sanction (such as respondent's improper demeanor on the bench). But we are not called upon to assess an appropriate sanction for each discrete finding of misconduct. Instead, we must determine the appropriate sanction for all of respondent's misconduct taken as a whole. We note, however, that "[t]his Court has consistently imposed the most severe sanction by removing judges for testifying falsely under oath." In re Adams , 494 Mich. 162, 186, 833 N.W.2d 897 (2013) (citing multiple cases). And we have previously found a conditional suspension appropriate when a judge "has not yet learned from his mistakes and that the likelihood of his continuing to commit judicial misconduct is high." McCree , 495 Mich. at 86, 845 N.W.2d 458.

The concurrence questions this Court's power to suspend a judge beyond her current term of office. Because no party has raised those issues here, we decline to address those issues in this case.